959 P.2d 394

CITY OF TUCSON, a municipal corporation, Plaintiff–Appellant, Cross Appellee,

v.

Grant WOODS, the Attorney General, substituted for the State of Arizona; Pima County, a political subdivision of the State of Arizona; Mike Boyd, Sharon Bronson, Raymond Carroll, Dan Eckstrom and Raul Grijalva, in their official capacity as members of the Pima County Board of Supervisors; Committee to Incorporate, Inc., an Arizona nonprofit corporation; and the Committee to Incorporate the Town of Tortolita, Defendants–Appellees, Cross Appellants.

No. 1 CA–CV 97–0503.

Court of Appeals of Arizona, Division 1, Department D.

Nov. 12, 1997.

Review Denied July 17, 1998.

Thomas J. Berning, Tucson City Attorney by Dennis P. McLaughlin, Senior Assistant City Attorney, Tucson, and Ulrich Kessler & Anger, P.C. by Paul G. Ulrich, Phoenix, for Plaintiff–Appellant, Cross Appellee.

Grant Woods, Attorney General by Eva K. Bacal, Assistant Attorney General, Tucson, for Defendant–Appellee Cross Appellant Grant Woods, Attorney General.

Anthony B. Ching, Phoenix, for Defendants–Appellees, Cross Appellants Pima County and Members of its Board of Supervisors.

Risner & Graham by William J. Risner, Tucson, for Defendant–Appellee, Cross Appellant Committee to Incorporate the Town of Tortolita.

Karp, Heurlin & Weiss, P.C. by Gregory E. Good, Tucson, for Defendant–Appellee, Cross Appellant Committee to Incorporate, Inc.

Snell & Wilmer, LLP by William N. Poorten III and Regina L. Nassen, Tucson, for Amicus Curiae Tucson Airport Authority, Inc.

## OPINION

KLEINSCHMIDT, Judge.

This is an appeal from an order of the Superior Court upholding a statute which allows certain communities in Pima County near the City of Tucson to incorporate as towns without the City's consent. We reverse because we find that the statute is a special or local law that violates Article 4, Part 2, Section 19 of the Arizona Constitution.[1]

Under Arizona Revised Statutes Annotated (A.R.S.) section 9–101 communities of 1,500 or more persons may be incorporated as cities or towns in either of two ways. When two-thirds of the qualified electors residing in the community petition the county board of supervisors, the board can declare the community incorporated without holding an election. When ten percent of the qualified electors petition the board, the board must call an election regarding the proposed incorporation. If a majority of the qualified

---

1. In spite of having expedited the consideration of this case, we were unable to complete the decision until after the election held on November 4, 1997, at which the incorporation of two communities in Pima County was to be decided. The parties preferred that we not issue a brief decision order before the election with an opinion to follow. Instead, they requested that we file a single, fully-explained opinion with the understanding that pending such filing, the decision of the trial court would remain in effect. That is what we have done.

electors votes in favor of incorporation, the board declares the community incorporated.

In 1961, the legislature attempted to prevent the fragmentation of local governmental structure by enacting another statewide statute, A.R.S. section 9–101.01, which allows a city or town in the area of another community seeking to incorporate to either annex the community or grant it permission to incorporate separately. The statute reads as follows.

### § 9–101.01. Incorporation, urbanized area

A. Notwithstanding any other provision of law to the contrary, all territory within six miles of an incorporated city or town, as the same now exists or may hereafter be established, having a population of five thousand or more as shown by the most recent federal census, and all territory within three miles of any incorporated city or town, as the same now exists or may hereafter be established, having a population of less than five thousand as shown by the most recent federal census is declared to be an urbanized area.

B. No territory within an urbanized area shall hereafter be incorporated as a city or town, and the board of supervisors shall have no jurisdiction to take any action upon a petition to incorporate a city or town within such area, unless:

1. There is submitted with the petition for incorporation a resolution adopted by the city or town causing the urbanized area to exist approving the proposed incorporation; or

2. There is filed with the board of supervisors an affidavit stating that a proper and legal petition has been presented to the city or town causing the urbanized area to exist requesting annexation of the area proposed for incorporation and such petition has not been approved by a valid ordinance of annexation within one hundred twenty days of its presentation.

During the 1996 regular legislative session, two identical bills, HB 2218 and SB 1255 were introduced which provided for a statewide repeal of A.R.S. section 9–101.01 defining territory within six miles of cities or towns with populations of 5,000 or more as an urbanized area. Neither bill was enacted.

During the 1997 regular legislative session, HB 2496 was introduced to eliminate the six-mile urbanized area statewide. The City of Phoenix and the League of Arizona Cities and Towns opposed the bill, and it was never enacted.

During the same legislative session, SB 1324, dealing with technical changes to the annexation statutes was, on motion of Representative William McGibbon, amended on the floor of the House to allow the suspension of A.R.S. section 9–101.01(A) for a limited period of time in Pima County only. This bill, which became Laws 1997, Chapter 204, § 2 reads as follows:

> Notwithstanding the provisions of section 9–101.01, subsection A, Arizona Revised Statutes, all territory within six miles of an incorporated city or town having a population of five thousand or more persons as shown by the most recent federal census that is within a county having a population of more than five hundred thousand but less than one million persons as shown by the most recent federal census is not an urbanized area for purposes of section 9–101.01, Arizona Revised Statutes, for the period between the effective date of this act and July 15, 1999.

It is conceded that the only place this provision can ever apply, given its short life, is within Pima County. It is the constitutionality of this provision, which we will frequently refer to hereafter as the "suspension statute," that is in question.

### TUCSON HAS STANDING TO MAINTAIN THIS ACTION

■ We will address arguments raised in the cross appeal first, since they deal with threshold matters. The State argues that the City of Tucson does not have standing to maintain this action. Citing *Town of Wickenburg v. State,* 115 Ariz. 465, 565 P.2d 1326 (App.1977), the State says that a municipality may not assert the constitutional rights of

others. Tucson, it argues, has no direct stake in its neighbors' incorporation.[2]

■ Courts invoke the doctrine of standing to ensure that their decisions are not mere advisory opinions, to ensure that the case is not moot and to ensure that issues will be developed by true adversaries. *Armory Park Neighborhood Ass'n v. Episcopal Community Services*, 148 Ariz. 1, 6 n. 4, 712 P.2d 914, 919 n. 4 (1985). All of these considerations are satisfied here. Tucson has a direct stake in seeing that the policy against piecemeal incorporation embodied in A.R.S. section 9–101.01 is not suspended. The very purpose of section 9–101.01 is to protect cites and towns from problems that may flow from the existence of many separate governmental entities in a limited geographical area. For example, in this case, if urban communities like Tortolita are allowed to incorporate, they, and their tax base, are forever lost to Tucson, even though Tucson may need that tax base. So, too, Tucson may be able to serve the needs of the area more efficiently than can a smaller town, and the inability to serve the needs of a wider area may impact adversely on the efficiency with which Tucson can serve the needs of all its citizens. *See City of Scottsdale v. McDowell Mountain Irr. and Drainage Dist.*, 107 Ariz. 117, 483 P.2d 532 (1971) (city was a "person affected" by the formation of an improvement district that might impede city's expansion and thus had standing to challenge such formation).

We also reject the argument that Tucson can only sue the State to vindicate rights bestowed on Tucson by the constitution and that A.R.S. section 9–101.01 is not a constitutional right. Article 4, Part 2, section 19(17) provides that no local or special laws may be enacted with respect to the incorporation of cities, towns or villages. Under that provision, Tucson has a constitutional right to be free of any local or special law relating to incorporation that affects it adversely.

## THE ATTORNEY GENERAL MAY BE SUBSTITUTED FOR THE STATE AS THE PROPER PARTY TO THE ACTION

■ In an argument related to its assertion that Tucson has no standing to maintain this action, the State, citing *Town of Wickenburg*, argues that it should not be a party to the suit because a municipality may not sue its creator to assert mere statutory rights bestowed upon it by that creator. We do not accept this argument because, as our discussion of the City's standing reveals, we believe the City is suing to vindicate a right guaranteed by the constitution.

This question has another facet. Because Tucson can obtain complete relief even if the State is not joined, no absolute necessity exists to include the State as a defendant. Tucson named the State because A.R.S. section 12–1841(A) provides:

A. When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. In any proceeding which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party and shall be entitled to be heard. In any proceeding in which a statute, ordinance, franchise or rule is alleged to be unconstitutional, the attorney general shall be served with a copy of the pleading, motion or document containing the allegation at the same time the other parties in the action are served and shall be entitled to be heard.

In *Ethington v. Wright*, 66 Ariz. 382, 189 P.2d 209 (1948), the supreme court, construing the predecessor to this statute, held that "[s]ince the Attorney General has the right to participate in such proceedings in behalf of

---

**2.** Even if the State is right, a lack of standing would not mean that the City should not be able to maintain this action against the other Defendants.˙ Only the State has asserted that the City lacks standing. A lack of standing is not jurisdictional in Arizona but is solely a rule of judicial restraint which can be waived. *State v. B Bar Enterprises, Inc.*, 133 Ariz. 99, 101 n. 2, 649 P.2d 978, 980 n. 2 (1982). *And see Cutter Aviation v. Arizona Dep't of Revenue*, 191 Ariz. 485, 494–496, 958 P.2d 1, 10–12 (App.1997) (assuming county lacked standing court could address challenge to statute to conserve judicial resources and avoid the expense of substituting individual taxpayers as parties).

the state, we conclude that it was not error to include him as a party defendant." *Id.* at 388, 189 P.2d at 215.

The State mounts a strong argument that *Ethington* was wrongly decided. It is for the supreme court, however, and not for us, to change *Ethington* if it is wrong. *See State v. Anderson,* 185 Ariz. 454, 916 P.2d 1170 (App. 1996).

The State also argues that *Ethington* is distinguishable because the statute on which it was based has been reenacted in different form. We have compared A.R.S. section 12–1841 with its predecessor, and in our opinion, they are the same in all material respects.

Tucson concedes that the Attorney General should be substituted as defendant in place of the State, and the State's only response to this is that such would, at this date, be "belated and imprudent." Since the Attorney General was properly served and has participated in this action fully, we grant the City's request to substitute the Attorney General for the State.

### EVIDENTIARY ISSUES

■ To support its argument that the suspension statute is an unconstitutional local or special law, the City has filed what it describes as census data purporting to show in great detail that there are many communities in Arizona located near towns and cities outside of Pima County that could incorporate, without the consent of their neighboring towns or cities, but for the fact that A.R.S. section 9–101.01 has not been suspended as to them. None of this data was presented to the trial court. The City says that the trial court ruled without giving it the opportunity to present additional evidence and without allowing it to cross-examine the persons who had provided affidavits in support of the Defendants' case. It does not seek reversal on this basis, but merely offers the court's denial of its requests as an explanation for why the data is presented here for the first time.

The City asserts that because the information is based purely on census figures, we can take judicial notice of it. We disagree. In an effort to meet the Defendants' objection

that there was no foundation for the information, the City filed in this court an affidavit of David Taylor, who is the Planning Program Coordinator for the City of Tucson's Planning Department. After listing his credentials, Taylor explains that he and his staff, using census data, have used well recognized and reliable computer software to "make an extract of those census block records lying within six miles of [certain relevant] cites and towns but which were in unincorporated areas...." The records were then, he says, "made more concise to eliminate extraneous data...." The foregoing is only a sample of the type of information Taylor describes. Assuming that we can even consider the Taylor affidavit, the problem is that it leaves unanswered questions as to the foundation for the census data, and it is impossible for us to understand and use the information without a further detailed explanation as to how it was compiled and what it represents. We cannot take judicial notice of it, and we will not consider it in support of our conclusion. *See* Ariz. R. Evid. 201 (information must be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned).

While we do not consider the City's detailed data, the Defendants have never asserted that there are no other urbanized areas outside of Pima County that could not take advantage of the suspension statute. Indeed, an affidavit filed by Representative William McGibbon, one of the sponsors of the suspension legislation, and a newspaper interview which he gave were both before the trial court, and both indicate that there are urbanized areas outside Pima County that could incorporate if the suspension statute applied to them. Were it otherwise, there would have been no resistance to statewide suspension. In any event, for the reasons we explain below, the City is entitled to prevail on the key issue even in the absence of the precise data it seeks to make a part of the record.

■ The Defendants also filed two affidavits in the trial court in support of their position. The affidavits are set forth in their entirety in the Appendix. One of them is the McGibbon affidavit referred to above.

McGibbon relates that the legislature considered all Arizona counties and concluded that Pima County had a unique problem. He says that the legislature learned that other counties had fewer and less severe problems that would be highly unlikely to rise to the level of those that exist in Pima County. He relates that Pima County has heavily populated unincorporated zones within six miles of Tucson that are suffering because they are not eligible for revenue sharing. He notes that two other counties expressly asked to be included within the ambit of the suspension legislation, but they were rejected because their problems were not as severe as Pima County's.

A significant part of the McGibbon affidavit cannot be considered in support of the Defendant's argument because a single member of the legislature is not able to testify regarding the intent of the legislature in passing a law. *Picture Rocks Fire Dist. v. Pima County,* 152 Ariz. 442, 444, 733 P.2d 639, 641 (App.1986). Whether the City opened the door to the affidavit by first introducing a newspaper article in which McGibbon conceded that there are other communities outside Pima County that are within six miles of neighboring cities and towns is unimportant. To the extent that the article contained an explanation of why the legislation was passed, it, too, should have been ignored by the trial court.

Part of the McGibbon affidavit is admissible, however. McGibbon was competent to testify that in his opinion the affected urban communities in Pima County are older and better developed than similar communities in other counties and that the Tucson communities are experiencing a loss of revenue as a result of their unincorporated status.

The Defendants also offered the affidavit of Frank Castro, a civil engineer who is the former Director of the Department of Transportation and Flood Control District for Pima County. Castro asserts that the legislature could reasonably conclude that the problems experienced by urban communities within six miles of Tucson are unique. Many of these areas, he says, are actually separate communities that have never been incorporated, and he adds, "Thus, there are no other counties in the state with six-mile . buffer zones similar to Pima County. Pima County's buffer zones are far more developed, far older, far more populated. Other counties's [sic] buffer zones are typically as they should be—new development ripe for orderly civic planning." In Castro's opinion, the problems of incorporation experienced in Pima County have resulted in acrimony between Tucson and Pima County and in a failure to effect a rational and orderly use of land. Communities elsewhere in the state, Castro says, have experienced an orderly pattern of annexation and incorporation. In Castro's opinion, the suspension statute is a good solution to the problem.

The Castro affidavit is in large part subjective opinion of questionable foundation. Unlike McGibbon, for example, he purports to characterize communities statewide without reference to how he, Castro, has any detailed knowledge of statewide conditions. Since the trial judge made no findings of fact or conclusions of law, we cannot be certain that he sifted the affidavits to discard what should not have been considered. But even if the Castro affidavit is considered in its entirety, for reasons that we will discuss in more detail when we turn to the substantive issue in the case, it does not go far enough, and the facts before the court do not provide a sufficient basis for upholding the suspension statute.

### THE SUSPENSION STATUTE IS AN UNCONSTITUTIONAL LOCAL OR SPECIAL LAW

Article 4, Part 2, § 19 of the Arizona Constitution provides in pertinent part:

No local or special laws shall be enacted in any of the following cases, that is to say:

. . . .

13. Granting to any corporation, association, or individual, any special or exclusive privileges, immunities or franchises.

. . . .

17. Incorporation of cities, towns, or villages . . .

. . . .

20. When a general law can be made applicable.

Another provision of the Arizona Constitution Article 13 § 1, provides that "Municipal corporations shall not be created by special laws, but the Legislature, by general laws, shall provide for the incorporation and organization of cites and towns ..."

██ The fundamental intent of these prohibitions on local or special laws is to prevent the enactment of statutes bestowing special favors on preferred groups or localities. *Eastin v. Broomfield*, 116 Ariz. 576, 584, 570 P.2d 744, 752 (1977). In *State Comp. Fund v. Symington*, 174 Ariz. 188, 192, 848 P.2d 273, 277 (1993), our supreme court expanded on the reasons as follows:

1. To prevent the legislature from providing benefits or favors to certain groups or localities;

2. To confine the power of the legislature to the enactment of general statutes conducive to the welfare of the state as a whole;

3. To prevent diversity of laws on the same subject;

4. To secure uniformity of law throughout the state as far as possible;

5 To prevent the granting of special privileges; and

6. To prevent the enlargement of rights of persons in discrimination against others' rights.

In *Petitioners for Deannexation v. City of Goodyear*, 160 Ariz. 467, 471, 773 P.2d 1026, 1030 (App.1989), we cited with approval the Kansas Supreme Court's criticism of special or local laws found in *Anderson v. Board of Comm'rs*, 77 Kan. 721, 95 P. 583 (1908). The Kansas court said, "Members [of the legislature] whose particular constituents are not affected by a proposed special law become indifferent to its passage." The legislative history of the suspension statute strongly suggests that the provision was the product of the very evil that the constitution was intended to guard against. When it proved politically impossible to enact a statewide abolition of the six-mile urbanized areas, those interested in allowing a suspension in Pima County may well have been able to enact the local provision because legislators from other counties whose constituents were not affected by it were "indifferent to its passage."

The critical case for analyzing whether a statute offends the constitutional provisions against special or local legislation is *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 800 P.2d 1251 (1990). That case arose out of a problem created in the 1970s and 1980s when a number of cities and towns extended their borders by annexing long narrow strips of property to encompass, without incorporating, large tracts of land. The purpose of such annexations, which had occurred throughout the state, was to prevent neighboring communities from annexing areas with potentially high tax values.

The court noted in *Town of Surprise* that in 1985 the legislature declared a moratorium on all annexations and revised the statutes to make the requirements for annexation more stringent. To correct past abuses, the legislature also wanted to include a provision permitting deannexation under certain circumstances. Attempts to enact a statewide statute failed, and ultimately, a provision that allowed deannexation in just twelve small cities in Maricopa County was passed. By its own terms, the statute was to expire in thirteen months.

The supreme court declared the statute an unconstitutional special or local law, noting that because it only applied to twelve small cities in a single county, it

discriminates *in favor of* larger municipalities in Maricopa county, as well as all cities and towns in other counties. On its factual basis alone, therefore, the statute could be attacked as ... unconstitutional special legislation because it denies a benefit to one class while conferring a benefit on another.

166 Ariz. at 148, 800 P.2d at 1256.

The court went on to hold that such a statute must meet every one of three tests to survive. First, the statute must bear a rational relationship to a legitimate legislative objective. *Id.* at 149, 800 P.2d at 1257. Second, the classification the statute creates must apply uniformly to all cases and to "all

members within the circumstances provided for by the law ..." *Id.* at 150, 800 P.2d at 1258. Third, the law must be "elastic, or open, not only to admit entry of additional persons, places, or things attaining the requisite characteristics, but also to enable others to exit the statute's coverage when they no longer have those characteristics." *Id.*

To determine whether the statute passes these three tests, we review the law *de novo* and accept the trial court's findings of fact, or in this case the inferences the court must necessarily have made, to support its ruling, unless those inferences are clearly erroneous or not supported by any credible evidence. *Phoenix Elementary School Dist. v. Green,* 189 Ariz. 476, 478, 943 P.2d 836, 838 (App. 1997).

We believe that the suspension statute fails all three tests. No legitimate and rational basis for the law appears in the record. When the evidence before the trial court is distilled to its essence, all it shows is that there are some well established unincorporated urban communities that have existed for a long time within six miles of Tucson that lack the benefits, and the revenue, that incorporation allegedly would bring. Indulging the affidavits to the absolute limit, these communities are older and better established than similarly situated communities anywhere else in the state. We also know, without benefit of any detail, that the situation affecting these communities has caused friction between the City of Tucson and Pima County.

There are other circumstances, touched on in oral argument and apparent from related statutes, that illuminate this problem. The communities the suspension statute seeks to benefit are not without a solution to the problems that ensue from the fact that they are not incorporated. They could request annexation by the City of Tucson. If the City refuses to annex them, they are at liberty to incorporate themselves as could any city or town that lies outside an urbanized area. *See* A.R.S. § 9–101.01(B)(1), (2) and (C). What emerges is that some urbanized areas want the benefits of incorporation, but they do not want to be a part of Tucson, preferring instead to govern themselves. At its core, the problem is the tension between the need for orderly development and efficient municipal administration which is embodied in A.R.S. section 9–101.01 on the one hand, and the desire for more direct self government reflected in the suspension statute on the other. The inquiry devolves into whether the urbanized areas in Pima County, assuming that they are older and better established than other urbanized areas in the state, should be entitled to more direct self government at the expense of efficiency than urbanized areas elsewhere in the state. While the Defendants have argued that the Pima County communities are unique, they have not explained, and the record does not disclose, why age and degree of development should give these communities a right to self government that no other urbanized areas elsewhere in the state can have. In our opinion, the Defendants have not shown that the statute has a legitimate and rational basis.

The second criterion for constitutionality is whether the legislation applies equally to all in a similar situation who come within its scope. *Town of Surprise,* 166 Ariz. at 149, 150, 800 P.2d at 1257, 1258. Not much need be said about this requirement, which appears to overlap the first test, because the statute obviously does not meet it.

The third factor for consideration is whether the legislation is elastic. It is conceded that the statute, specifically limited in time and area, can never apply to urbanized areas outside Pima County. The Defendants acknowledge this, but say that the statute is elastic because there is some potential for urban areas *within* Pima County entering or leaving the class as circumstances change. In measuring elasticity when the question is whether there is a reason not to apply the statute statewide, the relevant geographical area for consideration is the whole state, not just the area to which the statute, by its terms, applies. Were it otherwise, the statute, however special or local, would be impervious to challenge.

The Defendants have cited one case, *Picture Rocks Fire Dist.,* 152 Ariz. 442, 733 P.2d 639, which they argue answers all tests for the validity of the suspension statute and

compels a decision in their favor. In *Picture Rocks,* Division Two of this court upheld a statute that allowed property owners in a county having a population of 250,000 but less than one million to withdraw from fire districts when certain requirements were met. The only county that met the population requirement was Pima County. The statute was part of several laws enacted together, which included a statewide moratorium on the expansion of fire districts, that were intended to correct past abuses and abuses threatened in the future.

A fire district from which citizens had withdrawn challenged the statute as a special or local law. The court of appeals, applying the sole test of whether the statute had a rational basis, concluded that it did because there was evidence that fire districts in Pima County had abused their power by swallowing up large territories to increase the district's tax base, even though the districts had no ability to serve the territory. The court said: "The legislature could have concluded that Pima County was the only area within the state that needed immediate relief from abusive practices by fire districts and that a law with statewide application was not necessary." 152 Ariz. at 446, 733 P.2d at 643.

In *Town of Surprise,* the supreme court commented on *Picture Rocks* in a footnote, saying:

> We note that *Picture Rocks,* on which Division Two relied [in one of the cases the supreme court was reviewing] did not specifically apply the three standards first set out in *Arizona Downs [v. Arizona Horsemen's Foundation,* 130 Ariz. 550, 637 P.2d 1053 (1981) ] and clarified here. Instead, its analysis concentrated only on the rational basis standard. Nevertheless, this court denied review in *Picture Rocks.* Although we agree with the result reached in that case, we disapprove of the court's limited reasoning. Even if the court of appeals had applied the three-part test used for special/local law analysis, the statute in *Picture Rocks* would have been found constitutional. Thus, *Picture Rocks* did not compel the result reached by Division Two of the court of appeals in *Repub-lic Investment Fund I v. Town of Surprise.*

166 Ariz. at 149–150 n. 3, 800 P.2d at 1257–1258 n. 3.

We do not believe that *Picture Rocks* controls this case. First, the approval the supreme court voiced in *Town of Surprise* is dictum in which the court did not explain how the tests of constitutionality had been met in *Picture Rocks.* More important, *Picture Rocks* is distinguishable from our case. In *Picture Rocks,* the questioned statute was part of legislation that imposed a moratorium on the formation of fire districts while the legislature studied the problems attending the creation of special improvement districts. From all that can be discerned from the report of the case, the abuses relating to fire districts had occurred only in Pima County, and because of the moratorium, the abuses could never arise elsewhere in the state. In other words, the questioned law addressed the entire class that needed relief. In contrast, in the case before us it is conceded that there are urbanized areas throughout the state within six miles of other cities and towns. It is safe to assume that some of the citizens of these areas would like the benefits of incorporation without being annexed by their neighbors. They, however, are denied this choice.

The Defendants argue that even if the statute is inelastic, the offending provision relating to the automatic expiration of the statute can be severed, leaving the remainder intact. Unless we can conclude that the legislature would have enacted the valid portion of the statute absent the invalid provision, we must invalidate the entire statute. *State Comp. Fund v. Symington,* 174 Ariz. 188, 195, 848 P.2d 273, 280 (1993).

It is not just the automatic expiration date that renders the statute inelastic. It is the combination of the statute's short lifetime and its application to Pima County alone. If these limitations on time and area are dispensed with, A.R.S. section 9–101.01 would be effectively repealed statewide. The legislature twice refused to do this when it voted down a statewide suspension statute. The offending provision is not severable.

Even if we assume for the sake of argument that the automatic termination provision is all that would have to be severed to render the statute constitutional, we do not believe that severance would be appropriate. Given enough time, urbanized areas in other counties might be eligible to incorporate free of the strictures of section 9–101.01. The legislative history strongly suggests that this would not have been palatable to the legislature.

In a related argument, the County suggests that we should uphold the suspension statute because it is the only way to salvage section 9–101.01 itself from unconstitutionality. That is true, it argues, because section 9–101.01 allows cities and towns to withhold consent for their neighbors to incorporate without providing any guidelines as to how the city should exercise its discretion in approving or refusing to approve such requests. The cases cited in support of this proposition deal with delegations of legislative power to regulatory administrative agencies, and we do not believe they apply. Cases like *City of Tucson v. Garrett*, 77 Ariz. 73, 267 P.2d 717 (1954), are more instructive. In *Garrett*, the supreme court held that the legislature may delegate the power to a municipality to annex territory upon any condition it chooses. When the conditions, if any, are fulfilled, the municipality has total discretion as to whether to grant or deny annexation. *See also Roberts v. City of Mesa*, 158 Ariz. 42, 760 P.2d 1091 (App.1988) (annexation statute allowing citizens to petition for annexation was not an unconstitutional delegation of power on the theory that there was no standard or rule to govern choice to sign or not to sign).

## CONCLUSION

The Attorney General is substituted for the State as a party defendant. Laws of 1997, Chapter 204, § 2 is an unconstitutional special and local law. No incorporation which has occurred pursuant to the statute is valid. The Pima County Board of Supervisors was and is without authority to call elections pursuant to its terms. Arizona Revised Statute section 9–101.01 remains in full force and effect and is enforceable by the City of Tucson. The case is remanded to the superior court for any further appropriate action, consistent with this opinion, that may be required.

RYAN, P.J., and EHRLICH, J., concur.

## APPENDIX I

### AFFIDAVIT OF WILLIAM A. McGIBBON

WILLIAM A. McGIBBON, being first duly sworn upon his oath, deposes and says:

1. I am over the age of 18 and fully competent to testify to the matters set forth herein.

2. I am an Arizona State Representative representing District 9.

3. I am the Chairman of the House Natural Resources and Agriculture Committee, and the Prime Sponsor of an amendment to S.B. 1324, which sought among other things to remedy problems unique to Pima County.

4. The Arizona Legislature considered all Arizona counties when analyzing Section 2 of S.B. 1324. Specifically, we considered allowing incorporation in the six-mile buffer zone (without approval from neighboring municipalities) in counties other than Pima County.

5. However, we concluded that Pima County has very unique problems in its six-mile buffer zones, warranting legislation addressing Pima County alone. The uniqueness of Pima County became obvious.

6. We learned that counties other than Pima had fewer and less severe problems which would be highly unlikely to rise to the level of Pima County's problems. The law clearly developed as a Pima County solution to Pima County problems.

7. Pima County's problem of heavy population in sandwiched buffer zones caused a lack of state shared revenue funds in dense, aging, developed communities. This is a severe problem which does not exist elsewhere in the state. A two year sunset provided for a reasonable time to remedy the problems by allowing additional incorporations which would have the effect of equalizing distribution of tax revenues. These tax revenues would be used in newly incorporated areas to

remedy the historical lack of funding for these taxpayers.

8. Subsequent to the enactment of the law, Coconino and Yuma Counties requested that they be included, but those counties had already been considered and rejected because their problems were nowhere near Pima County's problems, and could not be expected to rise to the level of Pima County.

PURSUANT to 28 U.S.C. § 1746, I, William A. MCGibbon, declare under penalty of perjury that the foregoing is true and correct.

DATED this 25th day of August, 1997.

/s/ William A. McGibbon

### APPENDIX II

### AFFIDAVIT OF FRANK CASTRO

FRANK CASTRO, being first duly sworn upon his oath, deposes and says:

1. I am over the age of 18 and fully competent to testify to the matters set forth herein.

2. I am a professional civil engineer, and have been practicing in this profession in the State of Arizona and California for 19 years. My associates and I have performed professional civil engineering services in many parts of Arizona over the years, and my associates and I have a total of sixty years professional civil engineering experience throughout the State of Arizona. I am the former Director of the Department of Transportation and Flood Control District for Pima County. My colleague, Jerry Jones, held the same position.

3. Based on my experience, consultation with my colleagues, and analysis of the age, population and character of the so called six-mile buffer zones in Pima County as compared with the six-mile buffer zones in other areas of the state, I make the following comments.

4. The Arizona legislature would have been reasonable and accurate to conclude that most areas of the six-mile buffer zones in Pima county are of a completely different character than the six-mile buffer zones in other parts of the state. Pima County suffers particular problems which do not exist in other parts of the state, and are not likely to occur in other parts of the state.

5. I reach this conclusion based [on] the historical character of the areas, the age of the areas, and the trends in other counties. Specifically, the six-mile buffer zones in Pima County are far more populated and are remarkably older than other six-mile buffer zones in the state.

6. The Pima County buffer zones have essentially been unincorporated since their construction in the 1940's and 1950's. Without the aid of the funds associated with incorporation, these areas have relied exclusive[ly] on funding from Pima County to support infrastructure and community development.

7. Although many of the buffer zones in Pima County are actually separate communities in themselves, they have never been annexed into existing municipalities. This is apparently true because of the far flung nature of the acreage in Pima County and the desire of the City of Tucson to remain small, as distinguished from Phoenix and Los Angeles. In the face of substantial growth in the past 50 years, these unincorporated areas have been ignored in favor of a "small town" philosophy.

8. However, these areas have thrived, and the result is a[ ] non-orderly land use development regime leaving Pima County with huge developments, mature, dense, heavily populated, with their own character, and these communities should have been annexed or incorporated decades ago.

9. This land use and planning dilemma has plagued Pima County for decades. The City of Tucson and Pima County have been unable to assimilate these areas into coherent land use, transportation, governmental, and "community-minded" policies and plans. Efforts of consolidation of the City and County have failed miserably, leaving only acrimonious relationships between the City and County. This is a predictable result in a far flung county enduring nationally remarkable growth rates without orderly historical annexation and incorporation policies and effects.

10. These land use and planning failures in Pima County are absolutely unique in Arizona and do not exist elsewhere in the state. Pima County is in dire need of remedial legislation designed to address these problems. Elimination of the six-mile buffer zones in Pima County for a short time is a very rational solution which the legislature, wisely implemented in order to allow Pima County to bring an orderly governmental structure to a relatively chaotic picture.

11. Other areas in the state do not suffer these problems and will not suffer them in the future. This is true because as development has progressed and growth has continued in other counties, those counties have responded with orderly annexation and incorporation responses. Modern development codes and regional cooperation have prevented and will continue to prevent these kinds of problems from occurring elsewhere. Thus, there are no other counties in the state with six-mile buffer zones similar to Pima County. Pima County's buffer zones are far more developed, far older, far more populated.

Other counties's buffer zones are typically as they should be—new development ripe for orderly civic planning.

12. Because of the historical and monolithic nature of the problem in Pima County, which is not typical elsewhere, these problems are not going to occur in other Arizona counties.

13. It is eminently reasonable for the Arizona legislature to conclude as it did that Pima County has far greater problems in this regard which will not surface or become exacerbated in other Arizona counties.

14. Further, affiant sayeth naught.

DATED this 18th day of August 1997.

/s/ Frank Castro