340 F.3d 891
 Aspen Green, Resident and Qualified Elector in Tortolita; Neal Allen, Resident and Qualified Elector in Tucson; Judy Lester, Resident and Qualified Elector in Tucson; Jon Michael, Resident and Qualified Elector in Tortolita; Dorita Brady, Residient and Qualified Elector in Tortolita; Wallace J. Craig, Resident and Qualified Elector in Tortolita, Plaintiffs-Appellants,
v.
City of Tucson, an Arizona municipal corporation, Defendant-Appellee, Town of Marana; Town of Oro Valley, Intervenors-Appellees.
 No. 02-16700.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 13, 2003 — San Francisco, California.
 Filed August 20, 2003.
 
 William J. Risner, Kenneth K. Graham, Bisner & Graham, Tucson, Arizona, and Anthony B. Ching, Tempe, Arizona, for the plaintiffs-appellants.
 Dennis P. McLaughlin, Principal Assistant City Attorney, Tucson, Arizona, for the defendant-appellee and the intervenors-appellees.
 Appeal from the United States District Court for the District of Arizona; Raner C. Collins, District Judge, Presiding. D.C. No. CV-98-00456-RCC.
 Before: Procter Hug, Jr., John R. Gibson* and Raymond C. Fisher, Circuit Judges.
 OPINION
 FISHER, Circuit Judge:
 
 
 1
 Plaintiffs are residents and qualified voters of a community known as Tortolita, located in Pima County, Arizona. In 1997, an overwhelming majority of Tortolita's qualified voters petitioned the Pima County Board of Supervisors to incorporate Tortolita as a new municipality. Arizona law, however, prohibits the incorporation of a community unless all existing municipalities of 5,000 or more inhabitants within six miles of the community's boundaries give their prior consent. See Ariz.Rev. Stat. § 9-101.01. The City of Tucson and the Towns of Marana and Oro Valley ("Defendants") each has 5,000 or more inhabitants and lies within six miles of the boundaries of Tortolita. All three municipalities have opposed Tortolita's incorporation. Plaintiffs brought the present § 1983 action against Defendants, claiming that the consent requirement of § 9-101.01 violates the Equal Protection Clause of the Fourteenth Amendment because it unjustifiably burdens their right to vote on municipal incorporation.[1] Plaintiffs argue that the right to petition for incorporation granted by Arizona law is the constitutional equivalent of the right to vote and is therefore protected by the Equal Protection Clause. According to Plaintiffs, § 9-101.01's consent requirement violates equal protection because it places a condition on their right to vote while placing no such condition on unincorporated communities that happen to lie farther than six miles from any municipality of 5,000 or more inhabitants. Plaintiffs seek declaratory and injunctive relief as well as money damages. On cross-motions for summary judgment, Defendants prevailed. Plaintiffs now appeal.
 
 
 2
 We hold that § 9-101.01 does not violate equal protection and affirm the district court's grant of summary judgment in favor of Defendants. Although Arizona has created a constitutionally protected right to vote on municipal incorporation, § 9-101.01 does not unconstitutionally burden that right. In the absence of a suspect classification, the Supreme Court has applied strict scrutiny only to voting regulations that prohibit some residents in a given electoral unit from voting, or that dilute the voting power of some residents in a given electoral unit. Section 9-101.01 is not analogous to either of these two types of voting regulations because it treats all residents of the relevant electoral unit, Tortolita, equally. Section 9-101.01 admittedly draws geographical distinctions between those unincorporated communities that are near existing municipalities and those that are not, but we decline to extend strict scrutiny to this type of voting regulation. We conclude that § 9-101.01 is rationally related to Arizona's legitimate interest in regulating the establishment of new municipalities and in protecting the interests of existing ones.
 
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 
 3
 The facts of this case are undisputed.[2] Because the central issue is the constitutionality of Arizona's statutory scheme for municipal incorporation, we begin by briefly setting forth that scheme. Arizona law provides two routes by which the inhabitants of a community of 1,500 or more persons may seek incorporation as a city or town. Ariz. Rev. Stat. § 9-101(A-B). The first route, direct incorporation, is the one actually taken by Plaintiffs in this case. Under direct incorporation, if at least two-thirds of the community's qualified voters sign a petition calling for incorporation, the county board of supervisors "shall ... declare the community incorporated as a city or town." Id. § 9-101(A). The second route, incorporation by election, proceeds in two stages. First, if at least 10 percent of the community's qualified voters petition the board to hold an incorporation election, the board "shall ... call the election." Id. § 9-101(B). Then, if a majority of the community's qualified electors votes in favor of incorporation, the board "shall ... declare the community incorporated as a city or town." Id.
 
 
 4
 Before 1961, the same incorporation procedures applied to all unincorporated communities across the state, regardless of their proximity to existing municipalities. See Ariz.Rev.Stat. § 9-101(B) (1956). In 1961, however, the Arizona legislature added a statutory proviso for communities "within six miles of an incorporated city or town ... having a population of five thousand or more." Ariz.Rev.Stat. § 9-101.01(A). Section 9-101.01 designates such communities as "urbanized areas" and prohibits the board of supervisors from acting on a petition to incorporate urbanized areas unless nearby municipalities give their prior consent.[3] Id. § 9-101.01(B)(1). The stated purpose of the law is to "prohibit[] incorporation of urbanized areas unless approved by [the] city or town causing the urbanized area to exist." 1961 Ariz. Sess. Laws 113. Urbanized areas are exempt from the consent requirement if they have petitioned the nearby municipalities for annexation and the municipalities have failed to approve the annexation petition within 120 days of its presentation. Ariz.Rev.Stat. § 9-101.01(B)(2).
 
 
 5
 The unincorporated community of Tortolita is located in Pima County, Arizona, and lies within six miles of three municipalities, each with 5,000 or more inhabitants: the City of Tucson and the Towns of Marana and Oro Valley. Under § 9-101.01(B)(1), then, the residents of Tortolita must secure the consent of these municipalities in order to incorporate. In April 1997, the Arizona Legislature passed a statute suspending § 9-101.01(B)(1)'s consent requirement in Pima County between July 21, 1997 and July 15, 1999. 1997 Ariz. Sess. Laws 204 §§ 2.[4]
 
 
 6
 On July 21, 1997, the day the statute became effective, proponents of incorporation in Tortolita submitted a petition for direct incorporation to the Pima County Board of Supervisors under § 9-101(A). The petition was signed by 72 percent of Tortolita's qualified voters, more than the two-thirds needed. That same day, Tucson brought suit in state court against the State of Arizona and Pima County claiming that the 1997 statutory suspension of the consent requirement violated state constitutional prohibitions against special or local laws. See Ariz. Const. art. 4, part 2, § 19; Ariz. Const. art. 13, § 1.[5] The Arizona Superior Court upheld the constitutionality of the 1997 statutory suspension and on September 2, 1997, while Tuscon's appeal from this ruling was pending, the Pima County Board of Supervisors declared the Town of Tortolita incorporated and appointed an interim town council.
 
 
 7
 On November 12, 1997, the Arizona Court of Appeals reversed the superior court judgment, holding that the 1997 statute "is an unconstitutional special and local law" and that "[n]o incorporation which has occurred pursuant to the statute is valid." City of Tucson v. Woods, 191 Ariz. 523, 959 P.2d 394, 403 (1997). The Arizona Supreme Court denied review and the case was remanded to the superior court for further proceedings.[6]
 
 
 8
 On September 23, 1998, while state court proceedings were ongoing, Plaintiffs filed the instant § 1983 action in federal district court asserting that § 9-101.01 violates the Equal Protection Clause of the Fourteenth Amendment because it impermissibly burdens their right to vote on municipal incorporation.[7] Plaintiffs seek a declaration that § 9-101.01 is unconstitutional, a permanent injunction against the statute's operation, a declaration that Tortolita was validly incorporated on September 2, 1997 and unspecified damages.[8] On July 24, 2002, the district court granted summary judgment in favor of Defendants, holding that § 9-101.01 does not burden the right to vote and that the statute is rationally related to a legitimate state interest. Plaintiffs now appeal.
 
 
 9
 In a motion filed May 8, 2003, five days before oral argument, Plaintiffs requested that we affirm the district court's grant of summary judgment in favor of Defendants and reserved the right to seek en banc reconsideration. Plaintiffs did not appear at oral argument. Defendants, however, did appear and opposed Plaintiffs' motion.
 
 
 STANDARD OF REVIEW
 
 
 10
 We review a grant of summary judgment de novo. Oliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002). Because no genuine dispute of material fact remains, we need determine only whether the district court correctly applied the substantive law. See id.
 
 
 DISCUSSION
 
 
 11
 Plaintiffs' sole claim is that § 9-101.01 of the Arizona Revised Statutes violates the Equal Protection Clause of the Fourteenth Amendment, which provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); see also Lawrence v. Texas, ___ U.S. ___, 123 S.Ct. 2472, 2484, 156 L.Ed.2d 508 (2003) (O'Connor, J., concurring in the judgment). The Supreme Court has developed a tripartite structure for evaluating equal protection challenges to legislation. First, where the statute in question substantially burdens fundamental rights, such as the right to vote, or where the statute employs distinctions based on certain suspect classifications, such as race or national origin, strict scrutiny applies and the statute will be upheld only if the state can show that the statute is narrowly drawn to serve a compelling state interest. See, e.g., Grutter v. Bollinger, ___ U.S. ___, 123 S.Ct. 2325, 2337, ___ L.Ed.2d ___ (2003) (racial classifications); Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621, 627-28, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (right to vote). Second, where the statute draws distinctions based on certain other suspect classifications, such as gender, an intermediate level of scrutiny applies and the statute will be upheld if the government can demonstrate that the classification "substantially furthers an important government interest." Kirchberg v. Feenstra, 450 U.S. 455, 460, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). All other statutes are subject to the third and least exacting type of scrutiny, rational basis review, and will be upheld if they are rationally related to a legitimate governmental purpose. Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.").
 
 
 12
 Plaintiffs contend that strict scrutiny applies because § 9-101.01 substantially burdens their right to vote. According to Plaintiffs, § 9-101(A) has created a constitutionally protected right to vote on municipal incorporation. Although § 9-101(A) has to do with petitioning for direct incorporation rather than voting in an incorporation election, Plaintiffs argue that petitioning is the constitutional equivalent of voting, citing our decision in Hussey v. City of Portland, 64 F.3d 1260 (9th Cir. 1995). Plaintiffs claim that § 9-101.01 substantially burdens their right to vote on municipal incorporation because it effectively prevents them from exercising that right without the prior consent of Defendants, while placing no such restriction on residents of nonurbanized areas. According to Plaintiffs, § 9-101.01 does not survive strict scrutiny because Defendants have failed to show that it is narrowly drawn to serve a compelling state interest.
 
 
 13
 Defendants do not dispute that the statute would fail strict scrutiny. They claim, however, that rational basis review applies because § 9-101.01 does not burden the right to vote. Defendants further contend that § 9-101.01 satisfies rational basis scrutiny because its geographic distinction between urbanized and non-urbanized areas is rationally related to the state's legitimate interest in the orderly development and efficient administration of municipal government.
 
 
 14
 
 A. Whether Plaintiffs have a right to vote on municipal incorporation
 
 
 
 15
 We first address whether Plaintiffs have a constitutionally protected right to vote on municipal incorporation. As Defendants correctly point out, there is no inherent right to vote on municipal incorporation under the federal constitution. However, once a state grants its citizens the right to vote on a particular matter, such as municipal incorporation, that right is protected by the Equal Protection Clause. See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (recognizing as "implicit in our constitutional system, [a right] to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population"); Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) ("[T]his Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); see also Hussey, 64 F.3d at 1263 (holding that once citizens are granted the right to vote on municipal annexation, the exercise of that vote becomes protected by the Equal Protection Clause). The initial question, then, is whether Arizona has granted its citizens the right to vote on municipal incorporation. We conclude that it has.
 
 
 16
 We hold, in light of our decision in Hussey, that Arizona's petition procedure for direct incorporation is sufficiently similar to voting to be treated as such for equal protection purposes. In Hussey, also an equal protection case, we considered whether Oregon's "double majority" procedure for municipal annexation was constitutionally equivalent to voting. 64 F.3d at 1262-65. Under this procedure, a city wishing to annex territory had to obtain the written consent of (1) a majority of all voters registered in the territory to be annexed and (2) owners of a majority of the land in that territory. Or.Rev.Stat. § 199.490(2)(a)(B); see Hussey, 64 F.3d at 1262. Once the city obtained such written consent, it then had to file an annexation resolution with the Oregon Boundary Commission, which retained the ultimate authority to authorize or prohibit the proposed annexation. Or.Rev.Stat. §§ 199.460, 199.490(4)(e). Oregon law also provided for an alternative to the double majority annexation process: a conventional election by a majority of the ballots cast in the affected territory. Or.Rev.Stat. § 222.120(4)(a).
 
 
 17
 We concluded in Hussey that the written consents of voters required under the double majority annexation procedure were the constitutional equivalent of votes: "Both [votes and written consents] must be returned by registered voters; both are official expressions of an elector's will; both are required to resolve political issues; and both require a majority for success. Without the consent of a double majority of registered voters and landowners, Portland would have had to conduct an election to annex Mid-County." Hussey, 64 F.3d at 1263. We rejected the defendants' argument that "consents" are not votes because the ultimate annexing authority is vested in the Oregon Boundary Commission: "traditional voting often has no direct, dispositive effect, but rather takes effect only when acted upon by others. For example, voters do not choose the president, the electoral college does.... We decline to hold, therefore, that the annexation proceeding here did not involve voting merely because the Boundary Commission ... would have to approve any boundary changes before they took effect." Id. at 1264.
 
 
 18
 The same reasoning compels us to conclude that signatures on a petition for direct incorporation under Ariz.Rev.Stat. § 9-101(A) are the constitutional equivalent of votes. Like a vote on a ballot, a signature on a petition is an expression of a registered voter's will. And like an election, the petition process requires a majority for success, albeit a two-thirds majority. Furthermore, the petition process serves as a substitute for an election. If the direct incorporation route had been unavailable or unsuccessful, the only other way to incorporate Tortolita would have been through an incorporation election under Ariz.Rev.Stat. § 9-101(B). "Because the [petition signatures] are analytically like votes, and are a substitute for them, legally they must be treated as votes." Hussey, 64 F.3d at 1265. Consequently, we conclude that Arizona, in providing for direct incorporation under § 9-101(A), has granted qualified voters in unincorporated areas the constitutional equivalent of a right to vote on municipal incorporation. That right is protected by the Equal Protection Clause.[9]
 
 
 19
 
 B. Whether strict or rational basis scrutiny applies
 
 
 
 20
 Next, we must consider whether § 9-101.01 substantially burdens the right to vote on municipal incorporation, thereby requiring the application of strict scrutiny.[10] We conclude it does not, and consequently apply rational basis scrutiny.[11] While "[i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure," Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quotations omitted), courts do not "subject every voting regulation to strict scrutiny." Id. (applying rational basis scrutiny to a prohibition on write-in candidates). In the absence of a suspect classification, the Supreme Court has applied strict scrutiny to only two types of voting regulations. The first type includes regulations that unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election. See Dunn, 405 U.S. at 335-37, 92 S.Ct. 995 (state statute conditioning voter registration on one-year durational residency requirement); City of Phoenix v. Kolodziejski, 399 U.S. 204, 209, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (state statute conditioning right to vote on general obligation municipal bonds on property ownership); Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (state statute prohibiting residents of federal enclaves from voting in state elections); Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (state statute conditioning right to vote on public utility revenue bonds on property ownership); Kramer, 395 U.S. at 627, 89 S.Ct. 1886 (state statute conditioning right to vote in a school board election on real property ownership in the school district); Harper v. Va. State Bd. of Elections, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (state statute conditioning the right to vote on the payment of a poll tax); Carrington v. Rash, 380 U.S. 89, 93-94, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (state statute prohibiting members of the armed forces from voting in any state election if they moved to Texas during their tour of duty); see also Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 68, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978) (canvassing the Court's "voting qualifications cases" and noting that "a common characteristic emerges: The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned.").[12]
 
 
 21
 The second type are regulations that contravene the principle of "one person, one vote" by diluting the voting power of some qualified voters within the electoral unit. See Moore v. Ogilvie, 394 U.S. 814, 818-19, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) (state statute that made it more difficult for residents of populous counties to nominate candidates for the electoral college); Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (apportionment plan for the state legislature that weighted votes from rural counties more heavily that votes from urban counties); Gray v. Sanders, 372 U.S. 368, 379-81, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (county unit system that weighted rural votes more heavily than urban votes).
 
 
 22
 Contrary to Plaintiffs' claims, § 9-101.01 is not analogous to either of these types of regulations. Both the Dunn and Moore lines of cases are concerned with the equal treatment of voters within the governmental unit holding the election, be it a school district, a city or a state. See, e.g., Dunn, 405 U.S. at 336, 92 S.Ct. 995 ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." (emphasis added)); Gray, 372 U.S. at 379, 83 S.Ct. 801 ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote — whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever there home may be in that geographical unit." (emphasis added)). Our decision in Hussey was also concerned with the equal treatment of voters in a given electoral unit. 64 F.3d at 1262 (applying strict scrutiny to and striking down an ordinance that provided a subsidy to some voters in the area to be annexed, but not to other voters in the same area).
 
 
 23
 In this case, the relevant electoral unit is Tortolita — not Pima County as Plaintiffs claim. Only residents and qualified voters of Tortolita, not Pima County generally, may petition for Tortolita's direct incorporation under § 9-101(A) or for an incorporation election under § 9-101(B). And if an election were held on Tortolita's incorporation, it would be held in Tortolita only, not across Pima County. Therefore, our equal protection inquiry must focus on Tortolita rather than Pima County. We must ask whether some voters of Tortolita are prohibited from voting while others are not, or whether the votes of Tortolita residents are given unequal weight.
 
 
 24
 Once the relevant electoral unit is identified as Tortolita, it becomes clear that § 9-101.01 does not merit the application of strict scrutiny. It is undisputed Tortolita's qualified voters are treated equally with respect to the right to vote on municipal incorporation. They each have an equal say in a petition for direct incorporation. Unlike the statutes at issue in Supreme Court's voting rights cases, § 9-101.01 does not prohibit some Tortolita residents from voting while allowing others to do so, nor does it give the votes of some Tortolita residents unequal weight. All Tortolita residents are equally subject to § 9-101.01's consent requirement: none of their petition signatures for direct incorporation under § 9-101(A) has any force or effect unless Tucson, Marana and Oro Valley first consent to Tortolita's incorporation.
 
 
 25
 Section 9-101.01 undoubtedly discriminates, but it discriminates between different electoral units based on their proximity to existing municipalities, rather than between voters in any single electoral unit. The Supreme Court has never applied strict scrutiny to this type of voting regulation, and we decline to do so here. The Supreme Court has long recognized that states have broad authority over the establishment and development of municipalities within their borders.
 
 
 26
 Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state.... The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States.
 
 
 27
 Hunter v. City of Pittsburgh, 207 U.S. 161, 178-79, 28 S.Ct. 40, 52 L.Ed. 15 (1907). Plaintiffs correctly point out that Hunter is a due process case, not an equal protection case, and that it predates the Supreme Court's modern equal protection jurisprudence. The Supreme Court, however, has never expressly limited Hunter's reach to the due process context and relied on Hunter in applying rational basis review in Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), an equal protection case.
 
 
 28
 Holt involved an equal protection challenge to state statutes that subjected an unincorporated area to the police powers of Tuscaloosa, the neighboring municipality, without granting residents of the unincorporated area the right to vote in Tuscaloosa elections. Id. at 61-62, 99 S.Ct. 383. The plaintiffs claimed that the statutes infringed their fundamental right to vote and argued for strict scrutiny. After reviewing the same cases that Plaintiffs rely on here — Kramer, Cipriano and Evans — the Court held that the fundamental right to vote was not implicated because the right to vote in municipal elections ends at the city's geographical borders. Id. at 68-69, 99 S.Ct. 383. The Court decided to apply rational basis review, relying in part on Hunter:
 
 
 29
 While the broad statements as to state control over municipal corporations contained in Hunter have undoubtedly been qualified by the holdings of later cases such as Kramer v. Union Free School Dist., we think that the case continues to have substantial constitutional significance in emphasizing the extraordinarily wide latitude that States have in creating various types of political subdivisions and conferring authority upon them.
 
 
 30
 Id. at 71, 99 S.Ct. 383. Holt thus suggests that Hunter's unequivocal language regarding state control over municipalities applies in the equal protection context, tempered only by the Court's voting rights cases, which we have already distinguished above.
 
 
 31
 By enacting § 9-101.01, Arizona delegated some of its control over municipal subdivisions to existing municipalities by authorizing them to veto the incorporation of nearby communities. Tucson, Marana and Oro Valley have each exercised the veto granted to them by Arizona in order to prevent the incorporation of Tortolita. Apart from their claim that the veto violates the equal protection clause, Plaintiffs have not asserted that the municipalities exercised their veto for any unlawful purpose. Based on the reasoning of Hunter and Holt, we conclude that granting existing municipalities this veto falls within Arizona's "extraordinarily wide latitude [to] creat[e] various types of political subdivisions and confer[] authority upon them." Id. Strict scrutiny is therefore unwarranted.
 
 
 32
 We draw further support for the application of rational basis review from the Supreme Court's summary affirmance in Adams v. City of Colorado Springs, 308 F.Supp. 1397 (D.Col.1970), aff'd, 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970). Adams dealt with an equal protection challenge to Colorado's annexation statute, which gave voters in the territory to be annexed the right to vote on annexation if the territory was not more than two-thirds contiguous with the annexing city, but withheld the right to vote if the territory was more than two-thirds contiguous. Id. at 1400. The plaintiffs argued that the Supreme Court's voting rights cases supported the application of strict scrutiny, but the district court disagreed:
 
 
 33
 [I]t does not appear that the plaintiffs' rights are of the kind that have been upheld by the Supreme Court. The factor present in the cited cases which appears to have been crucial is that the franchise was granted to one group of persons to the detriment of another group. In most instances one group had votes with disproportionate weight as opposed to a group which was partially or wholly disenfranchised, or there has been a purposeful juggling of boundaries for the purpose of excluding a particular group.... In the case at bar ... it cannot be said that there exists the invidious discrimination which has been heretofore condemned by the Supreme Court. Hence, the only question which qualifies for consideration is whether the Assembly's classification is palpably irrational and, hence, constitutionally intolerable.
 
 
 34
 Id. at 1403 (footnote omitted). The district court applied rational basis scrutiny and upheld the annexation statute's constitutionality.
 
 
 35
 As Plaintiffs correctly point out, "a summary affirmance by [the Supreme] Court is `a rather slender reed' on which to rest future decisions." Morse v. Republican Party of Va., 517 U.S. 186, 203 n. 21, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) (quoting Anderson v. Celebrezze, 460 U.S. 780, 784-85, n. 5, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)). "[T]he precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions. A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." Anderson, 460 U.S. at 784-85 n. 5, 103 S.Ct. 1564 (internal quotation marks and citation omitted). This limiting language, however, does not undermine the precedential value of Adams for the case at bar because the district court's reasoning in Adams was essential to its holding. If the Supreme Court's voting rights cases had extended to the geographical distinction drawn in Colorado's annexation statute, then strict scrutiny would have applied and the Colorado statute would likely have been struck down. In affirming the district court decision in Adams, the Supreme Court necessarily approved the district court's determination that the voting rights cases were inapplicable and that rational basis scrutiny was the proper standard of review. We similarly conclude that rational basis scrutiny applies.
 
 
 C. Applying rational basis scrutiny
 
 
 36
 Plaintiffs do not argue that § 9-101.01 fails rational basis scrutiny, and with good reason. The statute easily passes constitutional muster under that standard. As the district court correctly noted, "Arizona has a legitimate state interest not only in regulating the formation of new municipalities, but also in protecting the interests of already existing municipalities." We conclude that § 9-101.01 is rationally related to that interest. As the Arizona Court of Appeals has recognized, "[t]he very purpose of [§] 9-101.01 is to protect cities and towns from problems that may flow from the existence of many separate governmental entities in a limited geographical area." City of Tucson, 19 P.3d at 660 (internal quotation marks and citations omitted). Municipal incorporation of areas on the fringes of existing cities and towns, if left unchecked, can lead to intergovernmental conflict over resources and economic development. See, e.g., Briffault, Our Localism, 90 Colum. L. Rev. at 77 ("Incorporation subtracts land and revenues from the surrounding jurisdiction and denies it to localities in the area. Incorporation on the urban fringe precludes the extension of central city boundaries to recapture middle-class residents who have moved to outlying areas."); Vaubel, Toward Principles of State Restraint, 20 Stetson L. Rev. at 16 ("Limiting incorporation also furthers a state policy of reducing the proliferation of local units of government. If left unheeded, proliferation could lead to loss of effective local government...."). Arizona has rationally chosen to prevent such inter-municipal conflict by giving existing municipalities a veto over the incorporation of neighboring areas.[13]
 
 
 CONCLUSION
 
 
 37
 Arizona has created a constitutionally protected right to vote on municipal incorporation. The Supreme Court's equal protection voting rights cases require that the residents of a given unincorporated community be treated equally with respect to the right to vote on incorporation. The state cannot unreasonably prevent some residents of the community from voting, nor can it dilute the voting power of some residents. Section 9-101.01 does not infringe these requirements, and therefore rational basis scrutiny applies. Arizona has a legitimate interest in the orderly development of municipal government, and § 9-101.01 is rationally related to that end. We therefore uphold § 9-101.01 as constitutional.
 
 
 38
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 The suit was initially brought against Tucson. Marana and Oro Valley subsequently intervened as additional defendants alongside Tucson
 
 
 [2]
 Many of the relevant facts are also recounted in our previous en banc opinion in this caseSee Green v. City of Tucson, 255 F.3d 1086, 1090-92 (9th Cir.2001).
 
 
 [3]
 Several other states have similar statutory provisions enabling "a municipality, otherwise devoid of power, to veto the incorporation of municipalities within a stated distance from the existing municipality." George D. Vaubel,Toward Principles of State Restraint upon the Exercise of Municipal Power in Home Rule, 20 Stetson L. Rev. 5, 16 & n. 42 (1990). In most states, however, "[n]eighboring localities ... outside the boundaries of the territory proposed to be incorporated generally have no role" in the incorporation process. Richard Briffault, Our Localism: Part I — The Structure of Local Government Law, 90 Colum. L. Rev. 1, 74 (1990).
 
 
 [4]
 The statute did not on its face single out Pima County, but Pima County was the only Arizona county that met the statutory criteria
 
 
 [5]
 A committee of Tortolita residents intervened as a defendant in the state court proceedings and, together with Pima County and another intervenor, counterclaimed against Tucson, arguing that the § 9-101.01(B)(1) consent requirement violates the Fourteenth Amendment's Due Process and Equal Protection Clauses, as well as Article IV's Guaranty Clause. The Superior Court did not reach the merits of the counterclaims because it upheld the constitutionality of the 1997 statutory suspension
 
 
 [6]
 On remand, the Superior Court reached the merits of Tortolita's constitutional challenges to § 9-101.01's consent requirement. The Arizona Superior Court ultimately upheld the constitutionality of § 9-101.01. The Arizona Court of Appeals subsequently affirmed and the Arizona Supreme Court denied reviewCity of Tucson v. Pima County, 199 Ariz. 509, 19 P.3d 650 (2001).
 
 
 [7]
 in their original complaint, Plaintiffs also asserted violations of the Due Process Clause and the Guaranty Clause. Plaintiffs dropped these claims in their second amended complaint, filed January 9, 2002
 
 
 [8]
 Tucson answered the federal complaint on the merits but also argued that the district court should abstain underYounger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The district court agreed with Tucson's Younger abstention argument and dismissed the case on February 18, 1999. On July 6, 2000, a three-judge panel of this court affirmed the dismissal pursuant to Younger. See Green v. City of Tucson, 217 F.3d 1081 (9th Cir.2000). An en banc panel of this court reversed the dismissal on July 9, 2001, holding that Younger abstention was improper, and remanded for further proceedings. See Green, 255 F.3d 1086. On remand, Oro Valley and Marana inter-vened as additional defendants alongside Tucson.
 
 
 [9]
 Many of the cases cited by Defendants are not relevant to the question whether Arizona has created a constitutionally protected right to vote on municipal incorporation, because in those cases the states in question had never granted a right to vote on incorporation or annexation on a statewide basisSee Barefoot v. City of Wilmington, 306 F.3d 113, 122-23 (4th Cir.2002) (holding that a municipality's annexation of neighboring territory did not implicate the right to vote — the mere fact that the state legislature had previously allowed some annexations to be conducted via referendum did not mean that any annexation thereafter had to be accomplished via referendum); Save Palisade Fruitlands v. Todd, 279 F.3d 1204, 1211 (10th Cir.2002) (holding that Colorado's decision to provide initiative power to home rule counties but not statutory counties did not implicate the fundamental right to vote: "The mere fact that the state created a right to an initiative process in home rule counties ... does not require that an initiative process be granted to all political subdivisions or with respect to all subjects."); Mixon v. Ohio, 193 F.3d 389, 403 (6th Cir. 1999) (rejecting an equal protection challenge to a state statute that provided for mayorappointed school boards in municipal school districts and elected school boards in other districts: "Although Plaintiffs have a fundamental right to vote in elections before them, there is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so.").
 
 
 [10]
 Defendants argue that we are bound by the Arizona Court of Appeals' determination that § 9-101.01(B)(1) is a mere precondition to the holding of an incorporation election and therefore does not burden the right to vote. We disagree. When deciding matters of Arizona law, we must follow the decisions of the Arizona Supreme CourtSee Johnson v. Fankell, 520 U.S. 911, 916, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997). We are also bound by the decisions of the Arizona Court of Appeals absent convincing evidence that the Arizona Supreme Court would decide the matter differently. See Martinez v. Gomez, 137 F.3d 1124, 1126 (9th Cir.1998). However, whether § 9-101.01(B)(1) burdens the right to vote for purposes of federal equal protection is a matter of federal, not state law. The decision of the Arizona Court of Appeals therefore informs but does not control this issue.
 
 
 [11]
 In their appellate briefs, Plaintiffs argued that § 9-101.01's geographic distinction between urbanized and non-urbanized areas requires the application of strict scrutiny because it burdens the voting rights of some Pima County residents but not others. However, on May 8, 2003, five days prior to oral argument, Plaintiffs changed their position. They filed a motion contending that underColumbia River Gorge United-Protecting People and Property v. Yeutter, 960 F.2d 110 (9th Cir. 1992), which they had only just discovered, geographical distinctions such as the one drawn in § 9-101.01 require only rational basis scrutiny. Plaintiffs conceded their case and urged us to affirm the district court's grant of summary judgment in favor of Defendants, but reserved the right to seek en banc rehearing. Plaintiffs declined to appear at oral argument. Defendants, however, appeared and opposed Plaintiffs' motion, arguing that Columbia River Gorge is not controlling. We agree with Defendants and deny Plaintiffs' motion.
 In Columbia River Gorge, we upheld an equal protection challenge to a federal statute that created an appointed commission to governland use planning in the Columbia River Gorge Area. Id. at 111-12. Residents of the Gorge area, which includes three Oregon and three Washington counties, claimed that the statute violated equal protection because residents outside the area could vote for their land-use planners while those inside the area could not. Id. at 115. Applying rational basis scrutiny, we upheld the geographic classification because "[p]reservation of the Columbia River Gorge Area is a permissible Congressional objective." Id.
 Columbia River Gorge is not relevant to the question whether strict or rational basis scrutiny should apply to the Arizona statute at issue here. As we acknowledged in Columbia River Gorge, that case did not involve a state law creating a constitutionally protected right to vote because any Oregon or Washington law that might have created such a right was effectively nullified by the federal statute creating the Columbia Gorge Commission:
 Insofar as the appellant argues that the Act violates electoral rights guaranteed by the state constitutions or local laws, this challenge fails. When Congress, acting within constitutional limits, creates federal law, state law is nullified to the extent that compliance with both the federal and the state law would be a physical impossibility.
 Id. The present case, in contrast, does not involve a federal statute; rather, it involves an Arizona state law that we have determined creates a constitutionally protected right to vote on municipal incorporation.
 
 
 [12]
 The Supreme Court has applied rational basis scrutiny toreasonable restrictions that exclude some residents in a given electoral unit from voting in a unit-wide election. See, e.g., Marston v. Lewis, 410 U.S. 679, 680-81, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973) (upholding 50 day durational residency requirement as reasonable because it permits county recorder time to certify correctness and completeness of voter registrations).
 
 
 [13]
 Because we uphold the constitutionality of § 9-101.01, we need not address Defendants' argument regarding the severability of that statutory provision from § 9-101