**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VICENTE TOPASNA BORJA; EDMUND FREDERICK SCHROEDER, Jr.; RAVINDER SINGH NAGI; PATRICIA ARROYO RODRIGUEZ; LAURA CASTILLO NAGI; RIGHT TO DEMOCRACY PROJECT, | No. 22-16742 |
| | D.C. No. 1:20-cv-00433-JAO-RT |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| SCOTT T. NAGO, in his official capacity as Chief Election Officer for the Hawaii Office of Elections; UNITED STATES OF AMERICA; FEDERAL VOTING ASSISTANCE PROGRAM; DAVID BEIRNE, in his official capacity as Director of the Federal Voting Assistance Program; LLOYD J. AUSTIN III, in his official capacity as Secretary of Defense; GLEN TAKAHASHI, in his official capacity as Clerk of the City and County of Honolulu, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Hawaii
Jill Otake, District Judge, Presiding

Argued and Submitted February 12, 2024
Honolulu, Hawaii

Filed August 30, 2024

Before:  RICHARD A. PAEZ, MILAN D. SMITH, JR.,
and LUCY H. KOH, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Richard A. Paez

## SUMMARY[*]

### Uniformed and Overseas Citizens Voting Rights Act

The panel affirmed the district court's summary judgment in favor of federal and state officials in an action brought by Vicente Topasna Borja, a former resident of Hawaii who has since moved to Guam, and others alleging that federal and Hawaii state election laws—specifically, the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) and Hawaii's Uniform Military and Overseas Voters Act (UMOVA)—violate their right to equal protection by giving rise to an absentee voting regime in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

which former voting-eligible residents of Hawaii who permanently move abroad or to the Commonwealth of the Northern Mariana Islands (CNMI) retain their ability to vote in Hawaii's federal elections by absentee ballot, whereas those who move to other U.S. Territories do not.

The panel affirmed the district court's holding that plaintiffs had Article III standing to challenge the enforcement of UOCAVA because they challenged their ineligibility for a federal benefit—the ability to vote in federal elections by absentee ballot—due to a discriminatory classification that privileges former voting-eligible residents of Hawaii who live abroad or in the CNMI over those who live in other U.S. Territories with permanent residents.

The panel held that rational basis review, not strict scrutiny, governed its review of UOCAVA and UMOVA's overseas voting requirements. While UOCAVA and UMOVA discriminate between former residents based upon whether they move overseas or within the United States, they do not deprive residents in a geographically defined governmental unit (Hawaii) from voting in a unit wide election, nor do they dilute the voting power of qualified voters within Hawaii. Plaintiffs failed to provide any binding authority requiring the application of strict scrutiny to voting laws that deny the ability to vote in a unit wide election to those residing outside of that unit. Nor are individuals who move from Hawaii to Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa a suspect or quasi-suspect class that would trigger heightened scrutiny.

The panel concluded that UOCAVA and UMOVA's treatment of former voting-eligible residents of Hawaii who move to Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa satisfied rational basis review. Plaintiffs

failed to meet their burden to negate every conceivable basis which might support UOCAVA and UMOVA's overseas voting classifications, nor did they provide any evidence that they were excluded from these laws' overseas voting provisions because of animus towards them.

Judge Paez dissented from the majority's decision not to apply the *Anderson-Burdick* framework in evaluating plaintiffs' constitutional challenge to UOCAVA and UMOVA. Under this framework, a court considering a challenge to an election law must weigh the character and magnitude of the asserted injury against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. Because the district court did not apply the *Anderson-Burdick* framework, Judge Paez would remand this case to the district court for further consideration under the proper legal standard.

## COUNSEL

Parker A. Rider-Longmaid (argued), Shay Dvoretzky, Andrew Hanson, Geoffrey M. Wyatt, Hanaa Khan, and Steven Marcus, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Zachary Martin, Skadden Arps Slate Meagher & Flom LLP, Boston, Massachusetts; Jeremy Patashnik, Skadden Arps Slate Meagher & Flom LLP, New York, New York; Pamela L. Colon, Law Offices of Pamela Lynn Colon LLC, Christiansted, Virgin Islands; Neil C. Weare, Equally American Legal Defense and Education Fund, Washington, D.C.; Vanessa L. Williams, Law Office

of Vanessa L. Williams, Hagåtña, Guam; Anthony Quan Jr., The QK Group, Honolulu, Hawaii; for Plaintiffs-Appellants.

Brian J. Springer (argued) and Michael Raab, Appellate Staff Attorneys; Clare E. Connors, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Jennifer H. Tran (argued), Lori N. Tanigawa, and Jennifer H. Crum, Deputy Attorneys General; Kaliko'Onalani D. Fernandes, Deputy Solicitor; Anne E. Lopez, Attorney General of Hawaii; Office of the Hawaii Attorney General, Honolulu, Hawaii; Dana A. Barbata, Civil Chief, Office of the United States Attorney, Honolulu, Hawaii; Robert M. Kohn and Ernest H. Nomura, Deputies Corporation Counsel, Honolulu City and County Department of the Corporation Counsel, Honolulu, Hawaii; for Defendants-Appellees.

Danielle M. Lang, Jonathan M. Diaz and Nicole H. Hansen, Campaign Legal Center, Washington, D.C.; Ruth M. Greenwood and Nicholas O. Stephanopoulos, Election Law Clinic at Havard Law School, Cambridge, Massachusetts; for Amicus Curiae Campaign Legal Center.

Dwyer Arce, Kutak Rock LLP, Omaha, Nebraska; for Amicus Curiae Virgin Islands Bar Association.

**OPINION**

M. SMITH, Circuit Judge:

Before 1975, Hawaii did not allow its former residents to continue voting by absentee ballot in its federal elections after they permanently moved from the state. Since then, however, federal law has required Hawaii to provide that right to its former voting-eligible residents who move outside of the United States. Today, under federal election law, the territorial United States includes Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa, but excludes the Commonwealth of the Northern Mariana Islands (CNMI), the only other U.S. Territory with permanent residents. As a result, former voting-eligible residents of Hawaii who permanently move abroad or to the CNMI retain their ability to vote in Hawaii's federal elections by absentee ballot, whereas those who move to one of the other aforementioned Territories do not.

Plaintiff Vicente Topasna Borja is a former resident of Hawaii who has since moved to Guam. He and others like him argue that the federal and state laws giving rise to this absentee voting regime violate the U.S. Constitution's guarantee of equal protection under the law, since they can no longer vote in Hawaii's federal elections, while others who moved abroad or to the CNMI can do so. The district court held that Plaintiffs had Article III standing to challenge the enforcement of the referenced absentee voting laws but granted summary judgment to the Defendants on the merits. We affirm.

### FACTUAL BACKGROUND

There are at least fourteen Territories that the U.S. Congress governs pursuant to the Territory Clause of the U.S. Constitution, which authorizes Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Only five of those Territories—Puerto Rico, Guam, the Virgin Islands, American Samoa, and the CNMI—have permanent residents. Spain ceded Puerto Rico and Guam to the United States at the conclusion of the Spanish-American War as a part of the Treaty of Paris of 1898, and the United States purchased the Virgin Islands from Denmark in 1917. American Samoa became a Territory in 1900, after Great Britain and Germany withdrew their competing claims to the islands and Samoan chiefs ceded the islands to the United States.

Only the most recently acquired Territory—the CNMI—voluntarily joined the United States on negotiated terms. At first, the Northern Mariana Islands were "part of the Trust Territory of the Pacific Islands" that the United States administered in the aftermath of World War II "pursuant to a Trusteeship Agreement with the United Nations Security Council." *Mtoched v. Lynch*, 786 F.3d 1210, 1213 (9th Cir. 2015). While people in "other portions of the [United Nations] trust territories [ultimately] decided to [form] independent nations," the people of the Northern Mariana Islands "elected to enter into a closer and more lasting relationship with the United States." *Id.* After extensive negotiations, the Northern Mariana Islands and the United States in 1975 executed a covenant, which set forth the parameters of the new relationship between the polities. *See id.* "After a period of transition, in 1986 the trusteeship

terminated," and the CNMI officially became a U.S. Territory. *Id.*

Shortly before the CNMI became a Territory, Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. §§ 20301–11. The purpose of UOCAVA was to "consolidate[] and update[] relevant provisions" of a federal election law that Congress had enacted a decade earlier, the Overseas Citizens Voting Rights Act of 1975 (OCVRA), with "only minor substantive changes." H.R. Rep. No. 99-765, at 6 (1986). Like OCVRA, UOCAVA requires each State of the United States to "permit absent . . . overseas voters to use absentee registration procedures and to vote by absentee ballot in . . . elections for Federal office." 52 U.S.C. § 20302(a)(1); *cf.* Pub. L. No. 94-203, 89 Stat. 1142, 1142–43 (1976) (repealed 1986).

UOCAVA defines an "overseas voter" to include a "person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States." 52 U.S.C. § 20310(5)(C). The Act in turn defines the "United States" to include "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." *Id.* § 20310(8). UOCAVA does not mention the CNMI or the U.S. Territories lacking permanent residents, and Congress has never amended UOCAVA's definition of the "United States" to include the CNMI, even though the CNMI has permanent residents and became a Territory shortly after Congress passed the law.

Several decades later, in 2012, the Hawaii Legislature enacted the Uniform Military and Overseas Voters Act

(UMOVA), Haw. Rev. Stat. §§ 15D-1 to -18, in which Hawaii not only codified its existing obligation under UOCAVA to allow its former voting-eligible residents who "le[ft] the United States" to vote in Hawaii's federal elections by absentee ballot, but also extended the allowance to Hawaii's state and local elections. Haw. Rev. Stat. § 15D-2; *see id.* §§ 15-D-3(2), -3(3). Unlike UOCAVA, UMOVA defines the "United States" to include "the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and *any* territory or insular possession subject to the jurisdiction of the United States." *Id.* § 15D-2 (emphasis added). However, state officials later promulgated an administrative rule to clarify that Hawaii continues to issue absentee "ballot packages" to voters covered by UOCAVA, meaning that Hawaii still allows its former voting-eligible residents who moved to the CNMI to vote by absentee ballot in Hawaii's federal elections. Haw. Admin. R. § 3-177-600(d)(4) (hereinafter, referred to as part of UMOVA).

Vicente Topasna Borja is a U.S. citizen who was born in Guam in 1950. In 1990, after twenty-eight years of Navy service, Borja moved to Hawaii on a humanitarian reassignment so that his wife could receive cancer treatment. Borja and his wife later moved back to Guam on another humanitarian reassignment. Had he moved to the CNMI, he could have retained his ability to vote by absentee ballot in Hawaii federal elections, but because he moved back to Guam, state election officials in Hawaii have barred him from doing so. And because none of the Territories with permanent residents participate in federal elections for President, Vice President, Representatives, or Senators, Borja argues he cannot meaningfully participate in any federal election at all, as Guam only sends a non-voting delegate to the House of Representatives. 48 U.S.C. § 1711.

Borja's predicament is shared by many others who previously were eligible to vote in Hawaii's federal elections by virtue of their residence there but later moved to one of the U.S. Territories with permanent residents other than the CNMI.

## PROCEDURAL HISTORY

Borja, four other former residents of Hawaii who currently reside in Guam or the U.S. Virgin Islands, and the Right to Democracy Project[1] (whose members include former Hawaii residents living in Puerto Rico and American Samoa) filed suit against Scott Nago, in his official capacity as Hawaii's Chief Election Officer; Glen Takahashi, in his official capacity as the Clerk of the City and County of Honolulu (together, the State Defendants);[2] as well as the United States; Lloyd J. Austin III, in his official capacity as the Secretary of Defense; the Federal Voting Assistance Program (FVAP); and David Beirne, in his official capacity as FVAP's Director (together, the Federal Defendants). Plaintiffs alleged that the Federal Defendants' enforcement of UOCAVA and the State Defendants' enforcement of UMOVA violate the U.S. Constitution's guarantee of equal protection under the law because they authorize absentee voting in Hawaii's federal elections by U.S. citizens who move from Hawaii to the CNMI or a foreign country, but not by U.S. citizens who move from Hawaii to Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa.

---

[1] The district court proceedings referred to the Right to Democracy Project by its former name: Equally American Legal Defense and Education Fund. *See* Dkt. 30.

[2] Plaintiffs also sued Kathy Kaohu, in her official capacity as the Clerk of the County of Maui, but voluntarily dismissed her before the case proceeded to summary judgment.

After Plaintiffs filed their third amended complaint, the Federal Defendants moved to dismiss for lack of subject matter jurisdiction, arguing in part that Plaintiffs' injuries are not traceable to their enforcement of UOCAVA (the federal law).  While the district court acknowledged that nothing in UOCAVA prevents Hawaii from allowing Plaintiffs to vote in Hawaii's federal elections by absentee ballot, the court determined that UOCAVA is still a source of Plaintiffs' "unequal treatment" with respect to overseas voting because UOCAVA requires Hawaii to extend the ability to vote by absentee ballot in Hawaii's federal elections to some former residents of Hawaii, i.e., those who move abroad or to the CNMI, but not to Plaintiffs.  Therefore, the court held that Plaintiffs' injury of "disparate treatment" was still traceable to the Federal Defendants' enforcement of UOCAVA.

The parties subsequently cross-moved for summary judgment, which the district court granted in favor of the State and Federal Defendants.  The district court reasoned that because "Territorial residents have no right to vote in federal elections and U.S. citizens who move to certain territories likewise have no right to vote absentee in their former states of residence," Plaintiffs failed to identify a "fundamental right" of which they have been deprived.  The court also explained that people "who move from a state to a territory are not a suspect or quasi-suspect class."  The court thus declined to apply strict scrutiny, concluding that rational basis review was appropriate.  Applying that deferential standard, the district court held that UOCAVA and UMOVA "satisfy rational basis review and do not offend equal protection principles."  On September 6, 2022, the district court entered judgment in favor of Defendants. Plaintiffs timely appealed.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction pursuant to 28 U.S.C. § 1291. *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 987 (9th Cir. 2009). "We review de novo a district court's determination whether a party has Article III standing." *Tucson v. City of Seattle*, 91 F.4th 1318, 1324 (9th Cir. 2024) (cleaned up). "We review [a grant of] summary judgment de novo." *Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).

**ANALYSIS**

## I.  Plaintiffs Have Article III Standing to Challenge the Enforcement of UOCAVA.

Plaintiffs and the Federal Defendants agree that Plaintiffs' inability to vote in Hawaii's federal elections is a cognizable injury-in-fact for the purpose of establishing Article III standing. They also agree that this concrete and particularized injury is fairly traceable to the State Defendants' enforcement of Hawaii state election law, whereby the State Defendants deny Plaintiffs the ability to obtain absentee ballot packages to participate in Hawaii's federal elections.

What these parties dispute is whether Plaintiffs have suffered an injury-in-fact that is fairly traceable to the challenged conduct of the Federal Defendants—i.e., their enforcement of UOCAVA. As the Federal Defendants correctly note, UOCAVA merely requires Hawaii to provide absentee ballot packages to its former voting-eligible residents who moved abroad or to the CNMI so that they may participate in Hawaii's federal elections; UOCAVA does not prevent Hawaii from extending that same right to Plaintiffs. Plaintiffs acknowledge that UOCAVA does not

prohibit Hawaii from extending absentee voting rights to them but maintain that UOCAVA's enforcement injures them because it deprives them of the benefit of its overseas voting provisions while extending the same to others.

We agree with Plaintiffs that they have Article III standing to challenge the enforcement of UOCAVA. This lawsuit arises from Plaintiffs' equal protection claim, in which they argue that they are being deprived the benefit of UOCAVA's overseas voting provisions because of a "discriminatory classification" that privileges former voting-eligible residents of Hawaii who live abroad or in the CNMI over those who live in the other U.S. Territories with permanent residents. The Supreme Court has long recognized that individuals have Article III standing to challenge their ineligibility for a federal benefit if they contend that their ineligibility is due to unconstitutional discrimination. *See Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see, e.g.*, *Heckler v. Matthews*, 465 U.S. 728, 739–40 & n.9 (1984). That is precisely how Plaintiffs have framed their challenge to UOCAVA. The possibility that their claim of unconstitutional discrimination may ultimately fail on the merits has no bearing on whether they have Article III standing to receive that adjudication on the merits in the first place. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022) ("For standing purposes, we accept as valid the merits of [the plaintiffs'] legal claims . . . ."); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . .").

Our conclusion is consistent with that of two of our sister circuits, which, when faced with similar equal protection

challenges to UOCAVA, adjudicated the merits of those challenges. *See Romeu v. Cohen*, 265 F.3d 118, 124 (2d Cir. 2001); *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 (1st Cir. 1994) (per curiam), *cert. denied*, 514 U.S. 1049 (1995). The only circuit to have declined to make a merits determination in a similar equal protection challenge to UOCAVA is the Seventh Circuit, which held that former residents of Illinois who moved to Puerto Rico, Guam, and the U.S. Virgin Islands lacked Article III standing to challenge UOCAVA's enforcement because Illinois law denied them the ability to vote absentee in Illinois' federal elections regardless of UOCAVA's enforcement. *See Segovia v. United States*, 880 F.3d 384, 388 (7th Cir.), *cert. denied*, 139 S. Ct. 320 (2018). Yet the Seventh Circuit did not recognize the well-established principle that individuals have Article III standing to challenge their ineligibility for a federal benefit if they contend their ineligibility is due to unconstitutional discrimination. In addition, neither of the two authorities upon which the Seventh Circuit relied to justify its conclusion that Article III standing was lacking involved claims of unconstitutional discrimination. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976) (action for judicial review of agency action pursuant to 5 U.S.C. § 702); *DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 595 (7th Cir. 2005) (action for judicial review of final orders of the Securities and Exchange Commission pursuant to 15 U.S.C. § 78y). Here, the equal protection framing of Plaintiffs' lawsuit is crucial to our analysis of whether Plaintiffs have Article III standing to challenge UOCAVA. Accordingly, the Seventh Circuit's standing analysis in *Segovia*, *see* 880 F.3d at 388–89, is unpersuasive.

It is true that the State Defendants in this case would deny Plaintiffs the ability to vote in federal elections by

absentee ballot regardless of UOCAVA's enactment. *See* Haw. Rev. Stat. §§ 15D-2, -3(2), -3(3). But it is equally true that the only reason they offer ballot packages to its former residents who move to the CNMI is because of the Federal Defendants' enforcement of UOCAVA. *See* Haw. Admin. R. § 3-177-600(d)(4) ("Ballot packages may generally be issued . . . [p]ursuant to a request by a voter covered under . . . [UOCAVA] . . . ."); *see also* Haw. Rev. Stat. § 15D-2 (CNMI considered part of the United States under Hawaii state election law). Put differently, the State Defendants do not offer the same benefit to Plaintiffs precisely because UOCAVA does not require them to give Plaintiffs that benefit. Plaintiffs argue that this differential treatment with respect to overseas voting rights under federal law is because of unconstitutional discrimination baked into (i.e., traceable to) UOCAVA's definition of what constitutes the territorial United States. The connection between the Federal Defendants' enforcement of UOCAVA and the State Defendants' differential treatment of Plaintiffs with respect to overseas voting rights can be drawn "without relying on 'speculation' or 'guesswork.'" *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013)); *see also Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, -- F.4th --, 2024 WL 3633795, at *7 (5th Cir. Aug. 2, 2024). That is enough to satisfy Article III standing to challenge UOCAVA's enforcement, *see, e.g.*, *Heckler*, 465 U.S. at 739–41 & n.9, even if the claim of unconstitutional discrimination with respect to overseas voting rights may ultimately fail on the merits.

We therefore affirm the district court's holding that Plaintiffs have Article III standing to challenge the

enforcement of UOCAVA (as well as UMOVA) and proceed to analyze the merits of their challenge.

## II. Rational Basis Review, and Not Strict Scrutiny, Governs Our Review of UOCAVA and UMOVA's Overseas Voting Provisions.

Plaintiffs argue that strict scrutiny governs our review of UOCAVA and UMOVA because the Supreme Court's decision in *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), requires the application of strict scrutiny to laws that selectively withhold the right to vote. Plaintiffs further argue that heightened scrutiny applies because these laws "discriminate against a politically powerless, suspect class." We address each of these contentions in turn.

### A. *Dunn* Does Not Require Us to Apply Strict Scrutiny to UOCAVA and UMOVA.

Plaintiffs concede that territorial citizens do not have a freestanding constitutional right to vote for President, Vice President, or voting Members of Congress. Plaintiffs also admit that there is no "freestanding constitutional right for former residents of Hawaii to vote in Hawaii's federal elections." Nevertheless, Plaintiffs maintain that UOCAVA and UMOVA impinge on a personal right of theirs protected by the Constitution—and are subject to strict scrutiny—because, as the Supreme Court made clear in *Dunn*, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." 405 U.S. at 336. In other words, Plaintiffs argue that because other former residents of Hawaii can participate in Hawaii's federal elections, Plaintiffs must be afforded that same right under *Dunn*.

We generally agree with Plaintiffs that U.S. citizens have a constitutionally protected right to participate in elections on an equal basis with other citizens in a particular jurisdiction. However, we disagree with Plaintiffs that such a principle applies here. In *Dunn*, the plaintiff was a resident of Tennessee at the time he challenged a Tennessee law that prevented him from voting in upcoming statewide elections because he had not yet resided "for a year in the State and three months in the county." *Id.* at 334. Here, by contrast, Plaintiffs are not residents of Hawaii. *Dunn* says nothing about how courts must review voting laws that restrict participation from individuals who are no longer physically resident within the relevant jurisdiction. Accordingly, *Dunn* does not require us to apply strict scrutiny to UOCAVA and UMOVA.

This conclusion is consistent with our prior decision in *Green v. City of Tucson*, 340 F.3d 891 (9th Cir. 2003), in which we interpreted the scope of *Dunn*'s reach. The plaintiffs in *Green* argued that an Arizona statute regulating how state residents in unincorporated communities could vote on municipal incorporation violated the Equal Protection Clause. The statute required that, prior to voting on incorporation, an unincorporated community had to first obtain the consent of any incorporated cities located within six miles with a population of at least 5,000 people. *Id.* at 894. The plaintiffs, who sought to incorporate their community, argued that this requirement unconstitutionally burdened their right to vote on municipal incorporation "because it effectively prevent[ed] them from exercising that right without the prior consent of [other cities], while placing no such restriction on residents of [unincorporated communities in] nonurbanized areas." *Id.* at 896.

We agreed with the plaintiffs that, under Supreme Court precedent, their statutory right to vote on municipal incorporation was protected by the Equal Protection Clause. *Id.* at 898. However, we declined to apply strict scrutiny to the Arizona statute. *Id.* at 898. That was because we interpreted *Dunn* to trigger strict scrutiny in only two scenarios: (1) where a law "unreasonably deprive[s] some residents in a geographically defined governmental unit from voting in a unit wide election," *id.* at 899 (citing *Dunn*, 405 U.S. at 335–37); and (2) where a law "contravene[s] the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit," *id.* at 900. We found that neither situation was applicable to the challenged statute. Rather, we concluded that rational basis review applied because the statute only "discriminate[d] between different electoral units based on their proximity to existing municipalities, rather than between voters in any single electoral unit." *Id.*

Our decision in *Green* forecloses Plaintiffs' argument that *Dunn* and its progeny require us to apply strict scrutiny UOCAVA and UMOVA. Despite Plaintiffs' arguments to the contrary, these laws do not "deprive . . . residents in a geographically defined governmental unit"—i.e., Hawaii— "from voting in a unit wide election"—i.e., Hawaii's federal elections. *Green*, 340 F.3d at 899. Nor does UOCAVA and UMOVA's exclusion of Plaintiffs "dilut[e] the voting power of . . . qualified voters within [Hawaii]." *Id.* at 900. Rather, these laws deprive Plaintiffs of the ability to vote in Hawaii's federal elections based upon the common-sense principle that once an individual moves elsewhere within the territorial United States, she has abandoned her right to vote in Hawaii-specific elections in favor of a right to vote in the elections that are specific to the jurisdiction within which she

has newly taken up residence. *Cf. Oregon v. Mitchell*, 400 U.S. 112, 122 (1970) ("Surely no voter qualification was more important to the Framers than the geographical qualification embodied in the concept of congressional districts."). While UOCAVA and UMOVA certainly discriminate between former residents based upon whether they move overseas or within the United States, they do not discriminate "between voters in any single electoral unit." *Green*, 340 F.3d at 900.

Ultimately, Plaintiffs have failed to provide us with any binding authority requiring us to apply strict scrutiny to voting laws that deny the ability to vote in a unit wide election to those residing outside of that unit. *Cf. Dunn*, 405 U.S. at 334 (observing that the plaintiff in *Dunn* did "not challenge Tennessee's power to restrict the vote to bona fide Tennessee residents"); *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978) ("[O]ur cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders."). In *Green*, we clearly cabined the Supreme Court precedent upon which Plaintiffs rely to equal protection challenges brought by individuals who are unable to vote in unit wide elections for the unit within which those individuals are residing. Accordingly, we need not apply strict scrutiny to laws that do not authorize Plaintiffs to vote in Hawaii's federal elections on account of *Dunn* because Plaintiffs no longer reside in Hawaii.

Plaintiffs disagree with this conclusion partly because they believe that the residential limiting principle we discerned in *Green* is inapplicable to their challenge. Specifically, Plaintiffs argue that the relevant "electorate" is not just those individuals residing within the "governmental

unit" of Hawaii; rather, the "electorate" of Hawaii now "comprises current and former Hawaii residents." But that argument plainly misconstrues UOCAVA's overseas voting provisions, and in doing so, fails to recognize how our federal system of government actually works.

Hawaii is a political unit with fixed geographic boundaries that exercises sovereignty in a manner consistent with our national Constitution. Hawaii, like every other state in the Union, participates in national governance by holding unit wide popular elections to appoint electors for President and Vice President and to select Senators and Representatives to represent the interests of the state and its people in Congress. In accordance with both common sense and our constitutional tradition, Hawaii has generally limited participation in those popular elections to its own residents. *See generally* U.S. Const. art. I, § 2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year *by the People of the several States . . . .*" (emphasis added)); U.S. Const. art. I, § 2, cl. 3 ("Representatives . . . shall be apportioned among the several States which may be included within this Union."); U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the State *wherein they reside*." (emphasis added)); U.S. Const. amend. XVII ("The Senate of the United States shall be composed of two Senators from *each State*, elected *by the people thereof . . . .*" (emphasis added)).

When Congress enacted UOCAVA and forced Hawaii to accept federal ballots from a small class of its former residents, Congress modestly redefined "the people" of Hawaii for the purpose of federal elections to include former voting-eligible residents of Hawaii who moved abroad but

retained their U.S. citizenship.[3]    Contrary to Plaintiffs' assertion, UOCAVA did not redefine the electoral "unit" of Hawaii to encompass all its former voting-eligible residents everywhere and then carveout exceptions at the expense of former residents who moved to other jurisdictions within the United States.    Nothing about UOCAVA (or Hawaii's implementation of it in UMOVA) has changed the basic constitutional reality that the political unit of Hawaii conducts Hawaii wide federal elections to represent the interests of Hawaii and its people in our institutions of federal government.

It is undisputed that Plaintiffs do not reside in the "geographically defined governmental unit" of Hawaii. *Green*, 340 F.3d at 899.  They want to vote in "unit wide election[s]" for Hawaii, but as our decision in *Green* makes abundantly clear, the Supreme Court's voting qualifications cases do not entitle them to strict judicial scrutiny of laws that do not authorize them to vote there.  After all, they have chosen to become part of the people of other jurisdictions within the United States, which have their own unit wide elections for participating in the institutions of the federal government.  *See, e.g.*, 48 U.S.C. § 1711 ("The territory of Guam and the territory of the Virgin Islands each shall be represented in the United States Congress by a nonvoting Delegate to the House of Representatives, elected as hereinafter provided.").  Accordingly, we reject Plaintiffs'

---

[3] The CNMI did not become a U.S. Territory until shortly after Congress enacted UOCAVA.  Accordingly, moving from Hawaii to the CNMI at the time UOCAVA was enacted meant moving abroad.

argument that we must subject UOCAVA and UMOVA to strict scrutiny.**[4]**

**B. Individuals Who Move from Hawaii to Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa Do Not Constitute a Suspect or Quasi-Suspect Class That Would Trigger Heightened Scrutiny.**

Having failed to show that they have a constitutionally protected right to participate in Hawaii's federal elections, Plaintiffs are left to argue that UOCAVA and UMOVA deny them the ability to vote absentee in Hawaii's federal elections on account of their membership in a suspect or quasi-suspect class. In Plaintiffs' telling, these laws "discriminate" against them because they are "a politically powerless, suspect class," thereby warranting the application of heightened scrutiny.

---

[4] We also decline to subject UOCAVA and UMOVA to some form of heightened scrutiny under the *Anderson/Burdick* sliding-scale framework. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992); *see, e.g.*, *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011) (discussing *Anderson/Burdick* framework). Plaintiffs never asked the district court to apply the *Anderson/Burdick* framework when they moved for summary judgment on their equal protection claim, instead raising this argument (albeit briefly) for the first time on appeal. "[W]e generally will not consider arguments raised for the first time on appeal," and we decline to exercise our discretion to do so here. *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1213 (9th Cir. 2020) (quoting *In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000)); *see Armstrong v. Brown*, 768 F.3d 975, 981–82 (9th Cir. 2014). This is especially warranted given that, at oral argument, Plaintiffs confirmed that "case after case from the Supreme Court and this court show that the best way to look at this" case is as a standard equal protection case, rather than as an *Anderson/Burdick* case.

This argument is without merit.  Individuals who move to a U.S. Territory, after having lived in Hawaii, do not bear the "traditional indicia" of a suspect or quasi-suspect class. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  While Plaintiffs are certainly correct that many residents of U.S. Territories "have endured a long history of discrimination" on account of their place of birth, race, or ethnicity, that history does not define Plaintiffs as a class in this suit.  *Cf. United States v. Mayea-Pulido*, 946 F.3d 1055, 1063 n.6 (9th Cir. 2020) (recognizing that individuals included within an alleged class may suffer discrimination not "on the basis of the classifications at issue" in their equal protection challenge).  Plaintiffs constitute a class in that they all once resided in Hawaii but then moved to Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa of their own accord.  However, Plaintiffs cannot be deemed members of a suspect or quasi-suspect class simply by virtue of their move to a U.S. Territory, and they have not shown that any of the "considerations in our usual test for determining whether heightened scrutiny applies" are present here.  *Id.* at 1063.

No court of appeals to have addressed the question of whether the government may consider an individual's residence in the U.S. Territories to determine whether she may take advantage of overseas voting provisions to participate in elections in her State of former residence has concluded that such classifications are subject to heightened scrutiny.  *See Segovia*, 880 F.3d at 390; *Igartua*, 32 F.3d at 10; *cf. Romeu*, 265 F.3d at 124 (concluding that UOCAVA survived equal protection challenge "regardless whether [its] distinction is appropriately analyzed under rational basis review or intermediate scrutiny, or under some alternative analytic framework independent of the three-tier standard

that has been established in Equal Protection cases"). Today, we join this emerging consensus and apply rational basis review.[5]

## III.  UOCAVA and UMOVA's Overseas Voting Provisions Survive Rational Basis Review.

"Rational basis review is highly deferential to the government, allowing any conceivable rational basis to suffice." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir.), *amended*, 881 F.3d 792 (9th Cir. 2018).  Nevertheless, Plaintiffs still argue that the Federal and State Defendants' enforcement of UOCAVA and UMOVA fails to survive that deferential standard "because their discriminatory treatment of former state residents living in [certain] U.S. [T]erritories serves no legitimate purpose."  Under rational basis review, it is Plaintiffs' burden "to negative every conceivable basis which might support" UOCAVA and UMOVA's overseas voting classifications, "whether or not the basis has a foundation in the record."  *Boardman v. Inslee*, 978 F.3d 1092, 1118 (9th Cir. 2020) (quoting *Heller v. Doe*, 509 U.S. 312, 320–21 (1993)).  We conclude that Plaintiffs have failed to do so.

We begin with Plaintiffs' argument that it is irrational for UOCAVA and UMOVA to treat residents of the CNMI as overseas voters for the purpose of federal elections while

---

[5] *See also Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J. (ret.), sitting by designation) (declining to apply strict scrutiny in equal protection challenge brought by plaintiffs with felony convictions seeking the right to vote in Arizona elections, holding that re-enfranchisement was a "statutory benefit," rather than a fundamental right, that could not be conferred "in a discriminatory manner . . . that is not rationally related to a legitimate state interest").

failing to do the same for residents of Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa. While Plaintiffs are correct that the United States's relationship with the CNMI has evolved a great deal since Congress enacted UOCAVA (for instance, the CNMI was not yet a U.S. Territory then), there are still aspects of the relationship today that conceivably justify the federal government treating the CNMI more akin to a sovereign country than a Territory of the United States for the purpose of overseas voting. For instance, the covenant governing the CNMI's consensual relationship with the United States continues to impose unique restrictions on the United States's ability to enact new legislation governing the CNMI. *See generally United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 752 (9th Cir. 1993). In addition, the full implementation of federal immigration law in the CNMI will not occur until December 31, 2029. *See* 48 U.S.C. § 1806(a)(2). While Plaintiffs may ultimately disagree with Congress's legislative judgment that moving to the CNMI is akin to moving to a foreign country for the purposes of overseas voting, rational basis review "does not allow us to substitute our personal notions of good public policy for those of Congress." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981). Accordingly, UOCAVA's exclusion of the CNMI from the list of U.S. Territories that are a part of the United States satisfies rational basis review.

Next, we examine Plaintiffs' argument that it is irrational for UOCAVA and UMOVA to create overseas voting rights for former residents of Hawaii who move to a foreign country while failing to do the same for those who move to Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa. While Plaintiffs may ultimately be correct that "former Hawaii residents living in [those Territories] have a

*greater* interest in federal elections than former Hawaii residents living in foreign countries because former state residents living in the territories are subject to the federal government's direct control," that observation fails to negate the several conceivable bases for justifying the differential treatment. For instance, in enacting UOCAVA, Congress could have reasonably determined that it was important to ensure that U.S. citizens living in foreign countries retained some opportunity to "participate in the election of governmental officials in the United States." *Romeu*, 265 F.3d at 124–25. Congress could have also reasonably determined that it did not need to do the same for U.S. citizens who move from a State to the U.S. Territories because they would still be eligible to participate in unit wide elections in their new homes. *See id.* at 125 (explaining that "citizens of a State who move to Puerto Rico may vote in local elections for officials of Puerto Rico's government (as well as for the federal post of Resident Commissioner)"). As the Second Circuit observed in *Romeu*, the laws here effectively treat Plaintiffs "in the same manner as [they] treat citizens of a State who leave that State to establish residence in another State." *Id.*

In failing to extend overseas voting rights to Plaintiffs, the Hawaii Legislature also could have reasonably determined that doing so would harm the interests of Hawaii's own residents, who arguably have the greatest interest in federal elections conducted in Hawaii. This is because the Members of Congress chosen in Hawaii's federal elections are tasked with representing the interests of Hawaii's residents in Congress, and Plaintiffs are both no longer Hawaii residents and are otherwise represented (albeit by non-voting representatives) in Congress. Accordingly, UOCAVA and UMOVA's overseas voting

provisions, which benefit former residents of Hawaii who move outside of the United States and not Plaintiffs, satisfy rational basis review.

Unable to negate every conceivable basis upon which Congress and the Hawaii Legislature could have relied to enact UOCAVA and UMOVA, Plaintiffs are left to argue they were excluded from these laws' overseas voting provisions because of animus towards them. *See Romer v. Evans*, 517 U.S. 620, 634 (1996); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). A plaintiff demonstrates the requisite animus by showing "that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). "Possible evidence includes disparate impact on a particular group, 'departures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" *Id.* (alteration omitted) (quoting *Arlington Heights*, 429 U.S. at 266–68).

Plaintiffs have failed to provide any evidence tending to show that Congress, in enacting UOCAVA, chose to privilege CNMI residents over residents of the other Territories because it harbored animus towards the latter. Nor have Plaintiffs provided any evidence tending to show that Congress or the Hawaii Legislature sought to cabin the benefit of their overseas voting provisions to those who move outside the United States because of a desire to harm those who stay within the United States by moving to one of the U.S. Territories with permanent residents. Accordingly, we agree with the district court that UOCAVA and UMOVA's treatment of former voting-eligible residents of

Hawaii who move to Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa satisfies rational basis review.

## CONCLUSION

We share Plaintiffs' and many of our colleagues' concern that the vast majority of "U.S. citizens residing in the [T]erritories are not being afforded a meaningful voice in national governance." *Romeu*, 265 F.3d at 136 (Walker, J., concurring). However, for the foregoing reasons, this lawsuit is not the proper vehicle to remedy that concern. Accordingly, we **AFFIRM** the district court's final judgment in favor of the State and Federal Defendants.

---

PAEZ, Circuit Judge, dissenting:

Consider the following scenario: two identical individuals—Person A and Person B—are longtime residents of Hawaii. For various reasons, both individuals decide to move to territories of the United States, Person A to the Commonwealth of the Northern Mariana Islands (CNMI), and Person B to Guam, which sits just about 37 miles southwest of the CNMI's southernmost island.[1] The twist, however, is that under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. 15 §§ 20301–11, and the Uniform Military and Overseas Voters Act (UMOVA), Haw. Rev. Stat. §§ 15D-1 to -18, Person A retains their right to vote in Hawaii, whereas Person B does not. Person B brings suit, viewing this distinction as arbitrary and violative of the Fourteenth Amendment's

---

[1] *See* Rota Island, Pacific Islands Benthic Habitat Mapping Center, https://www.soest.hawaii.edu/pibhmc/cms/data-by-location/cnmi-guam/rota-island/ (last viewed Aug. 23, 2024).

fundamental guarantee of equal protection with respect to voting rights.

In my view, the central question in this case is not simply whether Person B's challenge would be successful, but rather *under which analytical framework* we must examine their challenge. On this point, our caselaw is clear: we review constitutional challenges to laws that regulate elections under the *Anderson-Burdick* framework. As a consequence, we must apply *Anderson-Burdick* in such circumstances even if, as the majority suggests, the plaintiffs bring their challenge "as a standard Equal Protection case, rather than as an *Anderson/Burdick* case." Maj. Op. at 22 n.4. Otherwise, we risk depriving the franchise of the deference it is due. I therefore respectfully dissent from the majority's decision not to apply the *Anderson-Burdick* framework.[2]

\* \* \*

The *Anderson-Burdick* framework is derived from two Supreme Court cases. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). As the Court explained in *Burdick*:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the

---

[2] I concur, however, in the majority's determination that Plaintiffs have standing to challenge both UOCAVA and UMOVA.

burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

504 U.S. at 434 (citations omitted).

The Court has since confirmed that *Anderson-Burdick* is the proper legal standard for evaluating challenges to election regulations under the First and Fourteenth Amendments. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008). Heeding that command, our court applies *Anderson-Burdick* when assessing such constitutional challenges to "laws that regulate elections." *Mecinas v. Hobbs*, 30 F.4th 890, 904 (9th Cir. 2022) (quoting *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179,

1187 (9th Cir. 2021)).[3]  Indeed, with respect to voting rights in particular, our court has described *Anderson-Burdick* as "the appropriate standard of review for laws regulating the right to vote." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc) (citing *Burdick*, 504 U.S. 428).  Here, because Plaintiffs challenge "a state election law," *Burdick*, 504 U.S. at 434, that directly "affects the right to vote," *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n.2 (1st Cir. 1994),[4] I would review their claim

---

[3] As the Supreme Court in *Crawford* recognized, the Court's modern election cases have moved away from applying "litmus test" rules and "followed *Anderson*'s balancing approach."  553 U.S. at 190; *see also Gonzalez v. Arizona*, 677 F.3d 383, 409–10 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) (citing *Crawford*, 553 U.S. at 189–90) (observing the same).

[4] *Igartua* is one of three out-of-circuit cases to have directly considered the question we confront here.  *See* 32 F.3d at 10–11; *see also Romeu v. Cohen*, 265 F.3d 118, 122–26 (2d Cir. 2001); *Segovia v. United States*, 880 F.3d 384, 389–91 (7th Cir. 2018).  The *Igartua* court only examined UOCAVA, ultimately applying rational basis review because, though UOCAVA "affects the right to vote," it does not "infringe that right but rather limits a state's ability to restrict it."  32 F.3d at 10 n.2.  *Igartua* is thus of limited significance here, where Plaintiffs challenge both UOCAVA *and* the implementation of that statute by Hawaii.

More like this case is *Romeu*, which examined both UOCAVA *and* New York's derivative statute.  There, the Second Circuit declined to select between "rational basis review or intermediate scrutiny, or . . . some alternative analytic framework independent of the three-tier standard that has been established in Equal Protection cases," concluding that, under any such standard, "Congress may distinguish between those U.S. citizens formerly residing in a State who live outside the U.S., and those who live in the U.S. territories."  265 F.3d at 124.  In our circuit, selection of the appropriate standard of review in cases involving First and Fourteenth Amendment challenges to laws regulating the right to

under *Anderson-Burdick*.  *Cf. Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (concluding that, under *Anderson-Burdick*, Arizona's residential requirement for petition circulators created a "severe burden on [non-resident candidate] and his out-of-state supporters' speech, voting and associational rights").

The majority declines to apply *Anderson-Burdick* on the basis that "Plaintiffs never asked the district court to apply the *Anderson/Burdick* framework when they moved for summary judgment on their equal protection claim, instead raising this argument (albeit briefly) for the first time on appeal."**[5]**  Maj. Op. at 22 n.4.  Even so, however, "we are not bound by a party's erroneous view of the law."  *Flamingo Resort, Inc. v. United States*, 664 F.2d 1387, 1391 n.5 (9th Cir. 1982).  Moreover, identification of the proper legal standard under which to review this case is a "pure question of law and the [Government] will suffer no prejudice as a result of the failure to raise the issue in the trial court."  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1214 (9th Cir. 2020) (quoting *Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2007)).  Indeed, Defendants did not suggest that

---

vote occurs under *Anderson-Burdick*.  *See Pub. Integrity All.*, 836 F.3d at 1024.

Finally, *Segovia* examined only Illinois's derivative statute under the traditional equal protection framework and concluded that rational basis review applied.  880 F.3d at 390.  Again, given our court's clear caselaw, *Segovia* is not persuasive.

[5] The majority suggests that, "at oral argument, Plaintiffs confirmed that 'case after case from the Supreme Court and this court show that the best way to look at this' case is as a standard equal protection case, rather than as an *Anderson/Burdick* case."  Maj. Op. at 22 n.4.  Of course, Plaintiffs prefaced this statement with "I think *Anderson-Burdick* would get you to the same place."  Oral Arg. at 14:00.

Plaintiffs had forfeited the argument by not raising it in the district court; they instead disagreed with Plaintiffs on the merits.[6] Thus, in keeping with our precedents, I would apply *Anderson-Burdick* to this case.

Furthermore, because the district court did not apply *Anderson-Burdick*, I would remand this case for further consideration under the proper legal standard. *See Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011); *see also Gill v. Scholz*, 962 F.3d 360, 366 (7th Cir. 2020) (reversing and remanding to allow the district court to apply *Anderson-Burdick*); *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1344 (11th Cir. 2020) (same). To be sure, the district court may ultimately agree with *Igartua* that UOCAVA does not sufficiently burden Plaintiffs' fundamental rights so as to warrant exacting or strict scrutiny. Or the court may agree with *Romeu* that, regardless of the particular kind of scrutiny required to review UOCAVA and UMOVA, "Congress may distinguish between those U.S. citizens formerly residing in a State who live outside the U.S., and those who live in the U.S. territories." 265 F.3d at 124; *see also Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 531 (9th Cir. 2015) (en banc) (considering "the State's broad power to define its political community" as part of *Anderson-Burdick*'s second step (quoting *Sugarman v. Dougall*, 413 U.S. 634, 642–43 (1973))). In any case, Plaintiffs' constitutional challenge to the denial of their right to equal protection with respect to voting rights would benefit from further consideration under the *Anderson-Burdick* framework by the district court in the first instance. *Cf. Planned Parenthood of Greater Wash. & N. Idaho v. U.S.*

---

[6] *See* Fed. Appellees Br. at 29.

*Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110 (9th Cir. 2020) ("In general, an appellate court does not decide issues that the trial court did not decide."). The precious right to vote certainly deserves that much.

For the foregoing reasons, I respectfully dissent from the majority's decision to affirm the district court's judgment.